# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Carol Cantwell, Jae Jones, Jenny Rossano, Diana Tait, Michelle Ingrodi, Cindy Peters, Debra French, Kaye Mallory, Connie Sandler, David Rothberg, Karai Hamilton, Arnetta Velez, Christina Parlow, Demetrios Tsiptsis, and Terri Birt, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>The Coca-Cola Company; fairlife, LLC; Mike McCloskey; Sue McCloskey; and, Select Milk Producers, Inc.<br><br>               Defendants. | Case No. 1:20-cv-03739<br><br>**(Related to MDL No. 2909 and Lead Case No. 1:19-cv-03924-RMD-MDW assigned to the Honorable Robert M. Dow, Jr.)** |

## CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs Carol Cantwell, Jae Jones, Jenny Rossano, Diana Tait, Michelle Ingrodi, Cindy Peters, Debra French, Kaye Mallory, Connie Sandler, David Rothberg, Karai Hamilton, Arnetta Velez, Christina Parlow, Demetrios Tsiptsis, and Terri Birt (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated (the "Class," as defined below), bring this Class Action Complaint against Defendants The Coca-Cola Company ("Coca-Cola"), fairlife, LLC ("fairlife"), Mike McCloskey and Sue McCloskey (the "McCloskeys" or the "McCloskey Defendants"), and Select Milk Producers, Inc. ("Select Milk")[1] (collectively, "Defendants"). Plaintiffs base the allegations below on personal knowledge as to their own acts, and upon information and belief and the investigation of their attorneys as to all other matters, and allege as follows:

## NATURE OF THE ACTION

1. Defendants charge a premium for milk Products[2] branded under the name "fa!rlife" that promise the humane treatment of dairy cows. Defendants' branding and promises are designed specifically to target consumers who are willing to pay more to ensure that the livestock used to create those Products are treated ethically and humanely. Unfortunately for consumers, this is not true.

2. Fairlife Products are purportedly sourced from farms operating under a collective which purports to ensure that its dairy cows are treated with "extraordinary animal care and comfort."[3] The collective—Select Milk—was formed by Defendants Mike and Sue McCloskey

---

[1] Together, Coca-Cola, fairlife, and Select Milk are the "Coke Defendants."

[2] As described herein, Products refer to fairlife-branded packaged dairy goods sold nationwide. The labels of the different varieties of Products are substantially similar in the representations made to consumers ensuring the ethical treatment of the dairy cows used to create the Products.

[3] About Select Milk Producers, https://www.selectmilk.com/ (last visited June 18, 2020).

1

in 1994. Select Milk and Coca-Cola later created fairlife as a joint venture in 2012, with fairlife's foundation purportedly being centered on responsible farming practices, and treating "[fairlife's] cows better to help them produce the highest-quality milk possible."[4] A guiding principle, according to founder and Defendant Mike McCloskey, is "the better you treat an animal, the happier and more productive she is. It's a symbiotic relationship."[5]

3. These principles are reflected in the promises that Defendants make to the consumers who purchase the fairlife Products. Defendants represent that their Products help "make the world a better place" through a number of "promises" on the labels of the Products themselves, including the name of the product itself – fairlife – and the following:

> **Extraordinary care and comfort for our cows; Exceptional quality milk standards; Traceability back to our farms; Continual pursuit of sustainable farming.**

4. Defendants explicitly represent to consumers, *inter alia*, that animals associated with generating the milk used in the Products are treated in a more humane, comfortable, and compassionate manner that exceeds standard industry practices—in short, that they are given "extraordinary" care.

5. The very name of the brand, "fa!rlife," along with the pervasive marketing scheme reflected in the packaging and labeling of the Products deceives and misleads reasonable consumers into believing that the animals that produce the milk used in the Products are treated fairly and humanely.

---

[4] From Staple to Superfood: How fairlife's Belief in Better Milk is Shaking Up the Dairy Category, Coca-Cola (Feb. 3, 2015), https://www.einpresswire.com/article/247897642/from-staple-to-superfood-how-fairlife-s-belief-in-better-milk-is-shaking-up-the-dairy-category (last visited June 24, 2020).

[5] *Id.*

6.     To further induce reasonable consumers into believing that the cows are carefully managed, comfortable, and sustainably produce milk of exceptional quality that can be traced to Defendants' farms, Defendants, in particular fairlife and the McCloskeys, have invited consumers to "visit [Defendants'] flagship farm in Indiana" called Fair Oaks Farms to "see [the 'exceptional care taken every step of the way'] for themselves."

7.     This "exemplar farm" is part of Defendants' overall marketing strategy—demonstrating to consumers that Defendants are committed to transparency *and* traceability—providing consumers with full and complete information about their farming practices, while ensuring consumers that they can trace the Products they purchase back to the very grass that the cows ingested.

8.     Defendants' representations about humane animal *care*, the high *quality* of milk produced and used, the *traceability* of milk used, and the environmental *sustainability* of farming practices associated with the Products (hereinafter "Animal Welfare Promises") were material to consumers who purchased fairlife Products.

9.     But despite making these explicit Animal Welfare Promises, they were false, deceptive and misleading. Defendants did not live up to those promises: several undercover investigations revealed widespread abuse at farms that sourced fairlife Products—including at Defendants' "flagship farm" Fair Oaks.

10.     Undercover investigations and videos at Fair Oaks demonstrated that—as a matter of routine practice—its livestock suffered egregious abuse under the supervision of farm management.  Cows and calves were tortured, kicked, beaten with fists and blunt instruments, confined to tiny hutches, thrown, force-fed, burned, deprived of critical veterinary care, and forced to suffer environmental extremes including temperatures well over 100-degrees.  Animals

at Fair Oaks were subjected to such horrendous abuse that criminal charges were brought against three former Fair Oaks employees.

11.     The abuse at Fair Oaks is not an isolated incident: the animal cruelty and neglect documented at Fair Oaks was routine, commonplace, sanctioned by Defendants, and extensive to and throughout Defendants' network of affiliate farms—and Defendants have sourced and continue to source milk for the Products from other dairy producers that engage in similarly cruel and inhumane treatment of cows and calves.

12.     Defendants did not fulfill or live up to the explicit Animal Welfare Promises that they made to consumers, including that dairy cows that were used to create fairlife Products are treated ethically and humanely.  Defendants' failure to ensure that they were following these promises and representations to consumers — especially at the flagship farm location — is a violation of the explicit promises that Defendants made to consumers.

13.     Consumers — including Plaintiffs and other Class members as alleged herein — would not have purchased or would have paid substantially less for fairlife Products if they had known that Defendants did not live up to their promises.  Accordingly, consumers expected that Defendants would have the proper, company-wide, monitoring in place to follow the explicit promises Defendants made to consumers regarding the ethical and humane treatment of dairy cows - regardless of whether any drop of milk in a particular Product bought by a Plaintiff specifically came from an abused dairy cow.[6]

14.     Plaintiffs and the Class members suffered further injury as a direct result of Defendants' Animal Welfare Promises by being fraudulently induced to become unwitting

---

[6] In any event, as explained herein, Defendants represent that the milk is "traceable," so Defendants should be able to inform consumers whether the Products came from a farm that did not follow Defendants' explicit promises.

participants in the very animal cruelty and unsustainable large corporate factory farming practices they sought to avoid by purchasing and paying a premium for Defendants' Products in reasonable reliance on Defendants' promises and the related misbranding and deceptive marketing of the Products as "humane" and "family farmed."

15.     Plaintiffs bring this class action to stop Defendants' deceptive and unlawful practices, to stop Defendants' cruel and unsustainable dairy farming practices, and to recover monetary relief for Defendants' misconduct related to their false and misleading Animal Welfare Promises, and for the resulting injuries to Plaintiffs and the Class members.

## PARTIES

16.     Plaintiff Carol Cantwell is a citizen of California, residing in San Diego.  For the past four years or more, Plaintiff Cantwell purchased Defendants' Products from Vons grocery stores in Rancho Penasquitos and Torrey Highlands, and from Target in Poway.  Plaintiff Cantwell purchased Defendants' fairlife whole milk, chocolate milk and 2% milk at least once per week and six to eight times per month.  Prior to purchasing the Products, Plaintiff Cantwell reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon.  In reasonable reliance on the Animal Welfare Promises, Plaintiff Cantwell paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.  Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Cantwell attributed value to Defendants' Promises and Plaintiff Cantwell would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading.  Plaintiff Cantwell paid a price premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Cantwell encounter any of the Products in the future, she cannot rely on the

truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Cantwell would consider buying the current formulations of the Products in the future.

17.     Plaintiff Jae Jones is a citizen of Georgia and resides in Woodstock.  From approximately July or August 2018 to September or October 2019, Plaintiff Jones purchased Defendants' Products from Publix or Kroger in Holly Springs and Canton, Georgia.  Plaintiff Jones purchased Defendants' fairlife 2% milk Products and typically purchased at least one half gallon per week.  Prior to purchasing the Products, Plaintiff Jones reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon.  In reasonable reliance on the Animal Welfare Promises, Plaintiff Jones paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Jones attributed value to Defendants' Promises and Plaintiff Jones would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading.  Plaintiff Jones paid a price premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Jones encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Jones would consider buying the current formulations of the Products in the future.

18.     Plaintiff Jenny Rossano is a citizen of Georgia and resides in Savannah.  From approximately late 2014 until June 2019, Plaintiff Rossano purchased Defendants' Products from

Walmart near her prior home in North Miami Beach, Florida, approximately once per week. Plaintiff Rossano purchased the Defendants' 2% and skim milk Products. Prior to purchasing the Products, Plaintiff Rossano reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Rossano paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Rossano attributed value to Defendants' Promises and Plaintiff Rossano would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Rossano paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Rossano encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Rossano would consider buying the current formulations of the Products in the future.

19.     Plaintiff Diana Tait is a citizen of Illinois and resides in Norridge. For the past two years or more, Plaintiff Tait purchased Defendants' Products from Target, Marianos, and Jewel Osco in Illinois. Plaintiff Tait purchased Defendants' fairlife chocolate milk Product ten or more times. Prior to purchasing the Products, Plaintiff Tait reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Tait paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Tait attributed

value to Defendants' Promises and Plaintiff Tait would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Tait paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Tait encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Tait would consider buying the current formulations of the Products in the future.

20.     Plaintiff Michelle Ingrodi is a citizen of Maryland, residing in Frostburg. For the past two years or more, Plaintiff Ingrodi purchased Defendants' Products from Martins grocery stores in LaVale and Cumberland, from Weis grocery stores in Frostburg and Belair, from Walmart in LaVale, and from Amazon. Plaintiff Ingrodi purchased Defendants' fairlife chocolate and 2% milk products, in both the half gallon and individual sizes, for both herself and her family members; Plaintiff Ingrodi also purchased Defendants' protein shakes (strawberry banana, oats and honey) in individual serving sizes. Plaintiff Ingrodi purchased Defendants' Products on a weekly to bi-weekly basis. Prior to purchasing the Products, Plaintiff Ingrodi reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Ingrodi paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Ingrodi attributed value to Defendants' Promises and Plaintiff Ingrodi would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Ingrodi paid a price

premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Ingrodi encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Ingrodi would consider buying the current formulations of the Products in the future.

21.     Plaintiff Cindy Peters is a citizen of Michigan and resides in Harrison.  For the past two years or more, Plaintiff Peters purchased Defendants' Products from Kroger in Mount Pleasant and Meijer.  Plaintiff Peters purchased Defendants' fairlife chocolate and 2% milk, making a significant number of purchases over the past two years.  Prior to purchasing the Products, Plaintiff Peters reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Peters paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.  Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Peters attributed value to Defendants' Promises and Plaintiff Peters would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading.   Plaintiff Peters paid a price premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Peters encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.   If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Peters would consider buying the current formulations of the Products in the future.

22.     Plaintiff Debra French is a citizen of Missouri and resides in Springfield.  For the

past two years or more, Plaintiff French purchased Defendants' Products from Walmart and Krogers. Plaintiff French purchased Defendants' fairlife 2% chocolate milk Products on a weekly basis since 2016. Prior to purchasing the Products, Plaintiff French reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff French paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff French attributed value to Defendants' Promises and Plaintiff French would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff French paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff French encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff French would consider buying the current formulations of the Products in the future.

23. Plaintiff Kaye Mallory is a citizen of Missouri and resides in Columbia. For the past two years or more, Plaintiff Mallory purchased Defendants' Products from Walmart in Columbia, Missouri. Plaintiff Mallory purchased Defendants' fairlife 1%, 2% and chocolate milk Products, making roughly 250 such purchases. Prior to purchasing the Products, Plaintiff Mallory reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Mallory paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the

bargain in that Plaintiff Mallory attributed value to Defendants' Promises and Plaintiff Mallory would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Mallory paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Mallory encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Mallory would consider buying the current formulations of the Products in the future.

24.     Plaintiff Connie Sandler is a citizen of Minnesota and resides in Golden Valley. For the past two years or more, Plaintiff Sandler purchased Defendants' Products from Byerlys, Target, and occasionally Cub retailers. Plaintiff Sandler purchased Defendants' fairlife chocolate milk and skim milk roughly every week. Prior to purchasing the Products, Sandler reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Sandler paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Sandler attributed value to Defendants' Promises and Plaintiff Sandler would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Sandler paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Sandler encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the

truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Sandler would consider buying the current formulations of the Products in the future.

25.     Plaintiff David Rothberg is a citizen of New York, residing in Manorville.  For the past two years or more, Plaintiff Rothberg purchased Defendants' Products from Safeway and Whole Foods near 98th and Broadway in Manhattan.  Plaintiff Rothberg purchased the 2% version of Defendants' fairlife milk on approximately a weekly basis.  Prior to purchasing the Products, Plaintiff Rothberg reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon.  In reasonable reliance on the Animal Welfare Promises, Plaintiff Rothberg paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.  Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Rothberg attributed value to Defendants' Promises and Plaintiff Rothberg would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Animal Welfare Promises were untrue and/or misleading.  Plaintiff Rothberg paid a price premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Rothberg encounter any of the Products in the future, he cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Rothberg would consider buying the current formulations of the Products in the future.

26.     Plaintiff Karai Hamilton is a citizen of Pennsylvania and resides in Philadelphia. During the past two years, Plaintiff Hamilton purchased Defendants' Products from BJ's and Shoprite in Philadelphia.  Plaintiff Hamilton has also purchased Defendants' Products from Stop N Shop and from Big Y, and has purchased Defendants' Products in multiple states besides

Pennsylvania, including Texas and Connecticut. Plaintiff Hamilton purchased Defendants' fairlife chocolate milk in brown bottles, lactose/fat free milk in blue bottles, and high protein, omega-fortified milk in red bottles. Prior to purchasing the Products, Plaintiff Hamilton reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Hamilton paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Hamilton attributed value to Defendants' Promises and Plaintiff Hamilton would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Hamilton paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Hamilton encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Hamilton would consider buying the current formulations of the Products in the future.

27.     Plaintiff Arnetta Velez is a citizen of Texas and resides in McKinney. From approximately 2016 to 2019, Plaintiff Velez purchased Defendants' Products from Target stores in McKinney and Frisco, Texas, and at Sprouts in McKinney, Texas. Plaintiff Velez purchased Defendants' fairlife chocolate and, to a lesser extent, skim milk Products, usually at least once per month. Prior to purchasing the Products, Plaintiff Velez reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Velez paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants'

Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Velez attributed value to Defendants' Promises and Plaintiff Velez would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Velez paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Velez encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Velez would consider buying the current formulations of the Products in the future.

28. Plaintiff Christina Parlow is a citizen of Virginia and resides in South Chesterfield. For the past two years or more, Plaintiff Parlow purchased Defendants' Products from Walmart, Wawa and Food Lion in Midlothian, Virginia. Plaintiff Parlow purchased Defendants' Core Power, fairlife Reduced Fat and fairlife chocolate milk Products once per week. Prior to purchasing the Products, Plaintiff Parlow reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Parlow paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Parlow attributed value to Defendants' Promises and Plaintiff Parlow would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Parlow paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Parlow encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective

14

advertising.  If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Parlow would consider buying the current formulations of the Products in the future.

29.     Plaintiff Demetrios Tsiptsis is a citizen of Virginia and resides in Richmond.  For well over two years, Plaintiff Tsiptsis purchased Defendants' Products from Harris Teeter and Kroger in Virginia.  Plaintiff Tsiptsis purchased Defendants' fairlife chocolate and regular milk Products on a weekly basis.  Prior to purchasing the Products, Plaintiff Tsiptsis reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon.  In reasonable reliance on the Animal Welfare Promises, Plaintiff Tsiptsis paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.  Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Tsiptsis attributed value to Defendants' Promises and Plaintiff Tsiptsis would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Animal Welfare Promises were untrue and/or misleading.  Plaintiff Tsiptsis paid a price premium for empty promises of humane animal treatment that Defendants did not keep.  Should Plaintiff Tsiptsis encounter any of the Products in the future, he cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Tsiptsis would consider buying the current formulations of the Products in the future.

30.     Plaintiff Terri Birt is a citizen of Wisconsin and resides in Milwaukee.  Plaintiff Birt began purchasing Defendants' Products in November of 2018 from Meijer in Wauwatosa, Wisconsin and Metro Market in Milwaukee, Wisconsin, having made approximately 22 such purchases.  Plaintiff Birt purchased Defendants' fairlife chocolate milk, 2% reduced fat milk, 1%

low fat milk and fat free milk Products. Prior to purchasing the Products, Plaintiff Birt reviewed the Products' labels and relied on Defendants' Animal Welfare Promises thereon. In reasonable reliance on the Animal Welfare Promises, Plaintiff Birt paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Defendants' Animal Welfare Promises were part of the basis of the bargain in that Plaintiff Birt attributed value to Defendants' Promises and Plaintiff Birt would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Animal Welfare Promises were untrue and/or misleading. Plaintiff Birt paid a price premium for empty promises of humane animal treatment that Defendants did not keep. Should Plaintiff Birt encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Defendants take corrective action to ensure the truthfulness of the Animal Welfare Promises and/or correct the Products' labels, Plaintiff Birt would consider buying the current formulations of the Products in the future.

31.     Defendant fairlife, LLC is a Delaware limited liability company with its principal place of business located in Chicago, Illinois. fairlife, LLC, manufactures, markets, and sells the Products throughout the United States. Although it began as a joint venture between Select Milk and Coca-Cola, Coca-Cola acquired the remaining stake of fairlife from Select Milk in 2020 and now owns 100% of fairlife.

32.     Defendant The Coca-Cola Company is a Delaware corporation with its principal place of business located in Atlanta, Georgia. The Coca-Cola Company markets and distributes the Products, which it refers to as one of its "brands" on its website,[7] throughout the United

---

[7] *fairlife*, The Coca-Cola Company, https://www.coca-colacompany.com/brands/fairlife (last visited June 4, 2020).

States.  Coca-Cola exercises significant oversight over fairlife by engaging independent, third-party auditors to ensure the welfare of dairy cows that produce fairlife products.

33.     Defendants Mike McCloskey and Sue McCloskey are the co-founders of fairlife and are actively involved in the marketing, advertising, and labeling of the Products. The McCloskeys personally appear on behalf of fairlife throughout the United States and individual states in which one or more of the named Plaintiffs reside.  Individually, or acting in concert with fairlife, the McCloskeys actively participate in and direct the labeling, marketing, advertising, sale, promotion, and distribution of the Products.  Similarly, the McCloskeys, individually or acting in concert with fairlife, also have direct control and oversight over Defendants' treatment of cows at their many farms throughout the United States, including the flagship farm referenced in the Products' labeling.  Further, the McCloskeys are spokespersons for the Products, and make a personal "promise," signed under their own names, on the Products' labels regarding the fraudulent and misleading statements subject to this lawsuit, including the promise that Defendants provide "extraordinary care and comfort for [their] cows."  The McCloskeys perpetuate this personal "promise" by promoting the language on the deceptive labeling in other forums such as fairlife, LLC's website and social media platforms.

34.     Defendant Select Milk Producers, Inc. is a New Mexico marketing cooperative that was formed by the McCloskeys in 1994. Purportedly, "[f]ounded on honesty, trust, and quality," the 99 "family-owned" farms that form Select Milk's cooperative are providers of dairy for fairlife products.  Select Milk's farms pride themselves on quality, traceability, and sustainability, ensuring customers that "[y]ou can be rest assured that the more than 7 billion pounds of milk that Select Milk produces each year comes from innovative sustainable farming

and extraordinary animal care and comfort."[8]

## JURISDICTION AND VENUE

35.     The Court has personal jurisdiction over each of the Defendants.  The Court has personal jurisdiction over fairlife, because it resides in and is subject to the general jurisdiction of this District.  The Court also has personal jurisdiction over Mike and Sue McCloskey, because they are actively involved in the marketing, distribution, and sales of the Products throughout the United States, including in this District, and because of their interest in Defendant fairlife.  The Court also has personal jurisdiction over Coca-Cola because it markets, distributes, and sells the Products throughout the United States, including in this District, and because of its significant oversight over Defendant fairlife.  The Court has personal jurisdiction over Select Milk because it serves as the exclusive provider of milk products for Defendant fairlife, and includes farms and farming operations from this District.

36.     This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and the Defendants are citizens of a state different from that of at least one Class member.

37.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because fairlife's principal place of business is located in this District and substantial parts of the events or omissions giving rise to the claims occurred in the District.

---

[8] About Us, Select Milk Producers, Inc., https://www.selectmilk.com/ (last visited June 18, 2020).

## FACTUAL ALLEGATIONS

**Coca-Cola's Partnership with fairlife**

38.     In 2011, sales of major carbonated soft drinks were declining, affecting the bottom lines of companies like Coca-Cola.  Eager to increase sales of its product lines, in 2012, Coca-Cola formed a partnership with Select Milk Producers that would "rain[] money" for Coca-Cola.[9]

39.     [F]airlife's former CEO Stephen Jones, who is also a former Coca-Cola executive, publicly acknowledged that Coca-Cola's sale of a premium milk product would help to increase Coca-Cola's profits by also reversing declining milk consumption.  Betting on a premium milk product, Coca-Cola hoped that fairlife would be a significant driver of sales growth.

40.     Coca-Cola has, at all times relevant to this lawsuit, including to this day, maintained control over fairlife—including regulating animal welfare, expecting that its suppliers operate with the highest degree of integrity and comply with all laws, including animal welfare laws, and ensuring fairlife, among other things, audits dairy suppliers.[10]

41.     Coca-Cola's control over its suppliers includes enforceable Sustainable Agriculture Guiding Principles, and Supplier Guiding Principles, as well as an internal auditing process, all of which were in place throughout its relationship and ownership of fairlife.  This

---

[9] Coke Bets on "Premium Milk" to Boost Declining Category, *available at* https://www.agweb.com/article/coke-bets-on-premium-milk-to-boost-declining-category-NAA-associated-press (last visited June 24, 2020).

[10] This is from the version of the Coca-Cola website available on June 7, 2019, according to the Wayback Machine, *available at* https://web.archive.org/web/20190607155428/https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms (last visited June 24, 2020).

control is exerted from its corporate headquarters in Georgia.

42.     In January 2020, Coca-Cola acquired the remaining 57.5% stake in fairlife for $1.0 billion, subject to making future milestone payments which are contingent on fairlife achieving certain financial targets through 2020.[11]

**Animal Welfare Promises Are Central to Defendants' Marketing**

43.     It is no coincidence that Defendants branded their milk Products with the brand name "fairlife."  This prominent and ubiquitous claim—indeed, the brand itself—indicates to Plaintiffs and reasonable consumers that the fairlife dairy cows are treated "fairly," and have a "fair life" when compared to cows used to produce milk for other mass market milk brands. To further this messaging, Defendants devote an entire side of each milk package to the story about how humanely fairlife dairy cows are treated and make nearly identical animal welfare promises on the labeling and packaging of all of the Products.

44.     The packaging urges consumers to "LEARN OUR STORY" at fairlife.com, and Defendants' lengthy promise to treat fairlife dairy cows humanely just below that request implies that consumers can learn more about the humane lives the fairlife cows live.

45.     This representation is captioned with the heading "our promise," which is in bold font.

46.     Below the "our promise" heading, Defendants state that the Product is a "one-of-a-kind milk" arising out of "an ambition to provide the world with better nutrition while making the world a better place."  It then states that fairlife farmers take "exceptional care . . . every step of the way."

---

[11] Coca-Cola 2020 Annual 10k at 63, 138, *available at* https://investors.coca-colacompany.com/filings-reports/annual-filings-10-k.

47.     Next is a bullet-point list, in bold font, which states:

- "Extraordinary care and comfort for our cows"

- "Exceptional quality milk standards"

- "Traceability back to our farms"

- "Continual pursuit of sustainable farming"

48.     Defendants then invite consumers to "visit our flagship farm in Indiana so you can see for yourself!"  This refers to Fair Oaks Farms, where—as described further herein—the Animal Recovery Mission ("ARM") uncovered pervasive practices of animal abuse.

49.     At the very bottom of the label, the McCloskeys have a bold, prominent signature that is stylized to appear authentic and indicate that they personally guarantee the above representations.

50.     This side of the labeling is depicted below:

21



51.     Defendants' message that animal welfare is paramount to fairlife operations is reinforced by the front of the labeling, which includes a stylized drawing of a cow's face. The approachable drawing—reminiscent of an illustration in a children's book—is designed to encourage consumers to conclude that the animals are healthy, happy and treated humanely.

52.     The very name of the Products themselves - "fairlife" - itself reinforces Defendants' animal-welfare message. Among the recognized meanings of the word "fair" are "marked by impartiality and honesty"; "conforming with the established rules"; and, "clean,

22

pure."[12]  Particularly when coupled with a stylized drawing of an apparently happy, well-treated

cow, the very name "fairlife" suggests to reasonable consumers that fairlife's animals are treated

humanely.

53.    The front of the labeling is depicted below:



54.    Defendants' animal welfare and farming promises are reiterated and reinforced on

---

[12] *Fair*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/fair
(last visited June 24, 2020).

the fairlife website. As noted above, the "our promise" side of the labeling invites consumers to "LEARN OUR STORY" at the fairlife website: fairlife.com.

55. Prior to the public revelations of animal abuse (discussed in more detail below), the fairlife website contained a lengthy description of all the steps taken to make sure fairlife dairy cows and calves were treated humanely—better than they would have been treated at other dairy farms.

56. Prior to the public revelations of animal abuse in early June 2019, the fairlife website featured an "OUR PROMISE" page that stated, in relevant part:

> a. "We believe in doing better every step of the way, because it's the right thing to do. For us, 'better' means growing our own crops and putting our cows' well-being at the top of our list."

> b. "As dairy farmers, we treat our cows with the utmost care, because we know that their health and happiness are the foundation of our business. We grow the crops that feed our cows so we can ensure that they're getting high quality nutrition. We invite you to our flagship farm in Fair Oaks, Indiana, to see just how we do it."[13]

57. Prior to the public revelations of animal abuse in early June 2019, the fairlife website featured an "Our Farms" page that stated, in relevant part:

> a. "**BEST** *in* **CLASS ANIMAL CARE**: Co-founder Mike McCloskey got his start as a veterinarian specializing in dairy cows, so we know how

---

[13] This is from the version of the fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/ (last visited June 24, 2020).

important it is to put our cows' needs first. And since comfortable, healthy cows produce better quality milk, they reward us with some of the best milk in the industry."[14]

58.    Prior to the public revelations of animal abuse in early June 2019, the fairlife website featured an "Animal Care" page that stated, in relevant part:

a.    "**IT'S** *all* **ABOUT HER**: Our co-founder Mike McCloskey started his career as a cow veterinarian before turning to dairy farming, and under his care and guidance, we know that nothing is as important to us as the health and well-being of our animals. Our world revolves around making sure that our cows are fed well, treated humanely and live in comfortable, stress-free conditions."

b.    "**SPOILED** *from the* **VERY START**: Newborn calves are visually monitored daily and are given immediate and proper medical treatment should they become ill."

c.    "**COMFORTABLE** *at all* **TIMES**: She and her friends have comfortable beds and freestanding stalls, allowing them to walk freely while being protected from harsh weather. In the winter we keep wind and the elements out of their living areas by closing the curtained sidewalls of the barns. Cows love to stay cool, so in the warm summer months we use fans to maintain a 7 mph breeze over the feed manger and over the cows' beds.

---

[14] This is from the version of the fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/our-farms/ (last visited June 24, 2020).

We also spray our cows' skin with water many times a day in order to keep their body temperature down."

    d.    "**ALWAYS *in* GOOD HANDS**: We spend a significant amount of time training all of our employees not only in proper animal husbandry but also indoctrinating them as to why we will accept nothing less than the utmost care, respect and humane treatment of our cows."[15]

59.    In addition, prior to the public revelation of animal abuse, the website for Fair Oaks Farms linked to the farm's Facebook page, which explicitly stated that bull calves were not sent to be turned into veal. In a response posted on the Fair Oak Farms website, Mike McCloskey has now acknowledged that the representation regarding bull calves was untrue.[16]

60.    After the public revelation of widespread animal abuse at Fair Oaks Farms, fairlife changed its website to remove some of the most blatant misrepresentations. Nevertheless, the fairlife website still claims that animal welfare is an important part of its philosophy and operations. For example, the current fairlife website states, in relevant part:

    a.    "For dairy cows, it's about striving to provide a quality of life that not only incorporates basic health and safety needs, but also aims to minimize mental stress, accommodate natural behaviors, and avoid or minimize pain."

    b.    "For farmers and animal caretakers, it's about valuing and demonstrating

---

[15] This is from the version of the fairlife website that existed on April 20, 2019, according to the Wayback Machine, *available at* http://web.archive.org/web/20190420162213/https://fairlife.com/our-promise/animal-care/ (last visited June 24, 2020).

[16] *Official Statement From Our Founder Mike McCloskey On The ARM Video Release*, Fair Oaks Farms, https://fofarms.com/post/response/ (last visited June 24, 2020).

compassion and respect for the important role they play in caring for cows and ensuring that they in turn embody these core values in their daily care of animals."

c.     "Ensuring that the animals who provide fairlife dairy products are cared for and cared about is a top priority for failife."[17]

61.     Prior to the exposure of animal abuse, the Coca-Cola website also corroborated that the welfare of fairlife cows is one of the critical aspects of the Products.  For example, one prominently displayed marketing article about the introduction of the Products to the Canadian market referred to "high-quality milk and animal care practices, which pair well with the premium standards and passion for quality fairlife is known for."[18]

62.     Another marketing article prominently displayed on the Coca-Cola website before the discovery of animal abuse, entitled *From Staple to Superfood: How fairlife's Belief in Better Milk is Shaking Up the Dairy Aisle*, repeatedly emphasized Defendants' animal-welfare claims:

a.     "We've always known that the better you treat an animal, the happier and more productive she is. It's a symbiotic relationship."

b.     "The McCloskeys formed the co-op of fellow family-owned farms in 2004, gradually building a network of progressive farmers who share their 'grass to glass' commitment to milk quality, animal care and environmental sustainability. All fairlife products can be traced back to the

---

[17] *What We Believe*, Fairlife, https://fairlife.com/what-we-believe/ (last visited June 24, 2020).

[18] This is from the version of the Coca-Cola website that existed on July 12, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180612212301/https://www.coca-colacompany.com/stories/fairlife-ultrafiltered-milk-coming-to-canada (last visited June 24, 2020).

dairies their milk comes from."

c.   "When we share our story of how we treat our cows and focus on their comfort and care and creating a stress-free environment, that really resonates with people who visit our farm . . . ."[19]

63.   Defendant Select Milk Producers, Inc. further reinforces and supports fairlife's animal welfare promises.  Its website states in relevant part:

a.   Select Milk Producers, Inc. takes the guesswork out. You can rest assured that the more than 7 billion pounds of milk that Select Milk produces each year comes from innovative sustainable farming and extraordinary animal care and comfort.

b.   [W]e opened up Fair Oaks Farms so people could see exactly how our Family Dairy Farm Members operate.[20]

64.   Fair Oaks Farms is the "flagship farm" for the fairlife brand that Defendants invite consumers to visit and hold out to the public as the exemplar of their commitments to animal welfare and transparency, as well as the source of Defendants' fairlife Products complained of herein.

65.   Indeed, Fair Oaks Farms, the subject farm of two animal cruelty investigations discussed below, is claimed to be the gold standard of Select Milk producer's collective of farms. If Defendants were exercising proper oversight to ensure that their Animal Welfare Promises

---

[19] This is from the version of the Coca-Cola website available on January 21, 2018, according to the Wayback Machine, *available at* https://web.archive.org/web/20180121142609/http://www.coca-colacompany.com/stories/from-staple-to-superfood-how-fairlifes-belief-in-better-milk-is-shaking-up-the-dairy-category (last visited June 24, 2020).

[20] *About Us*, https://www.selectmilk.com/ (last visited June 24, 2020).

were truthful and accurate, then—at the very least—the Fair Oaks Farms exemplar farm should have been exercising best practices to ensure animal welfare and humane treatment.

66. A reasonable consumer would understand from each of the representations described above that fairlife's sourced dairy farms prioritize animal welfare and treat their cows with the utmost care and kindness. Moreover, they are mutually reinforcing such that they work together to strengthen this message to consumers that fairlife's cows are treated well.

**Defendants' Animal Welfare and Farming Promises Are False**

67. Defendants prey on consumer desire for more humanely-treated animals—doing so while systematically abusing and torturing the dairy cows that produce the milk in the Products.

68. On June 4, 2019, and on June 12, 2019, ARM released the results of an undercover investigation it conducted of Fair Oaks Farms.[21]

69. An undercover investigator working for ARM was hired as a calf-care employee at Fair Oaks Farms. In that role, the investigator bottle fed newborn calves, assisted loading calves on transports, and disposed of dead calves. The investigator used surveillance equipment to capture the normal daily practices on the farm.

70. ARM also placed an investigator in the milking areas of Fair Oaks Farms, where they documented day-to-day operations with cows.

71. ARM's investigator found "extreme animal abuse" that was evidently "the normal way to do business at Fair Oaks Farms." Daily or commonplace practices included:

---

[21] The results of ARM's undercover investigation are available at https://animalrecoverymission.org/wp-content/uploads/2019/06/Operation_Fair_Oaks_Farms_Dairy_Adventure.pdf (last visited June 24, 2020).

a.      Brutally throwing newborn calves in and out of their huts;

b.      Dragging calves by their ears (including from a motorized cart) or by their tails and legs;

c.      Pushing, throwing, slapping, kicking, stomping and slamming calves to the ground if the calves did not nurse from the artificial rubber nipple during the feeding process;

d.      Dumping formula on the ground instead of feeding it to calves, thereby denying them the appropriate nutrition and hydration needed to survive;

e.      Withholding veterinary care from the numerous emaciated cows, which had a body score of two or three on a nine-point scale used to measure cattle body conditions (being either too thin or "borderline" thin);

f.      Forcing vulnerable newborn calves into filthy and unsanitary conditions;

g.      Joking with other employees while sitting on top of a calf, whose legs buckled because they could not support the extra weight;

h.      Stabbing and beating calves with various objects including steel rebars, hard plastic milking bottles, and steel branding irons;

i.      Burning calves' faces and bodies with hot branding irons, often in retribution for the calf's noncompliance with worker demands;

j.      Dumping the corpses of cows and calves unable to survive the abuse and torture into mass graves hidden from farm tourists where they were left to rot;

k.      Twisting and breaking tails of cows who would not move in the milking parlor;

l.      Cows with infected eyes, broken tails, and infected udders being forced onto milking machines;

m.     Blood- and manure-covered cows being forced onto milking machines to collect milk for the Products;

n.      Cows too weak to walk being forced onto milking machines;

o.      Kicking, beating, punching, pushing, and otherwise abusing cows;

p.      Dangerously pinning cows inside milking-carousel machinery and allowing them to fall out of it;

q.      Dragging downed cows (those unable to stand or walk without assistance) with straps who were too sick or weak to walk;

r.      Packing cows into overcrowded housing;

s.      Denying medical care to sick cows, including downed cows who were left to die slowly;

t.      Failing to provide proper shelter from extreme elements, including forcing newborn calves to languish and suffer in temperatures well exceeding 100 degrees;

u.      Separating calves from their mothers soon after birth (distressing both animals); and

v.      Calves being sold to a veal farm where they are confined to tiny veal crates.

72.     Notably, none of the footage of abuse captured during the ARM investigation took place in areas open to the public. In fact, Defendants put in place policies at its "flagship farm" that were designed and intended to hide its animal abuse and other practices they believed

would compromise the carefully crafted and false claims they present to the public.

73.     The ARM investigation is also notable for what it did *not* find.  The investigator never observed disciplinary action being taken against any employee, even though knowledge of the animal abuse was known and perpetuated at all levels of employment, including foremen and upper management.  Law enforcement was never contacted or notified by fairlife management.

74.     The ARM investigator found no medical attention paid to calves or cows, even though the fairlife website claimed the contrary.  Veterinary attention was not provided even when calves showed obvious signs of distress including languishing, bellowing in pain, or bleeding from open wounds often caused by worker abuse.

75.     Adult cows that became sick or injured also did not receive treatment. When adult cows were too sick to produce milk, they were shot or left to languish and die slowly. When the cows were shot, small-caliber bullets were improperly used by untrained workers.  As a result, the cows frequently suffered for hours before they died.

76.     ARM's investigator received training related to the transportation of dead calves. Employees were instructed to "always take the back dairy roads while transporting the dead to a hidden dump area" to prevent any tourists or tour buses from seeing the workers disposing of the dead animals.

77.     Male calves were sold to veal farms—contrary to Defendants' Animal Welfare Promises and Fair Oaks Farms' explicit promise that this would not be done—where they were held in such small enclosures that they were unable to turn around and were forced constantly to stand in their own feces until they were ultimately killed.

78.     Defendants hold out their "flagship farm" as representative of each dairy operation that produces the milk for the Products.  Defendants' marketing and labeling tells

consumers that the Animal Welfare Promises and the husbandry practices required to achieve those promises are implemented at all dairy operations producing milk for the Products.

79.     Other fairlife suppliers model their operations on the processes, infrastructure, employee training (or lack thereof), and other husbandry practices used at fairlife's "flagship farm" in Fair Oaks, Indiana.  This includes oversight (or lack thereof) and auditing procedures to ensure that representations concerning animal welfare are accurate.   In brief: if fairlife's "flagship farm" was not following best practices, and Defendants were failing to exercise oversight or ensure that their representations about animal treatment were being followed at Fair Oaks, then they had no basis to make their Animal Welfare Promises.

80.     A culture of animal abuse pervades all of fairlife's dairy suppliers.  This culture of abuse is known to upper management at individual dairy operations as well as by Defendants.

81.     Despite knowing of this culture of abuse and the daily suffering of the cows under its care, Defendants have failed and continue to fail to implement common sense measures to ensure "extraordinary care" of its cows as promised.

82.     In addition to the abuse and substandard care at Defendants' "flagship farm," Defendants have sourced and continue to source milk for the Products from other dairy producers that engage in similarly cruel and inhumane treatment of cows and calves, as described herein.

83.     At the time of the above described abuses, both of these dairy producers were operating under the National Dairy Farmers Assuring Responsible Management (FARM) program, a program developed in part by Mike McCloskey and purportedly used to ensure proper animal care on participating farms.  FARM purports to "show customers and consumers that the dairy industry holds itself to the highest standards" and "is taking the very best care of

33

cows."[22]   Across the United States, 98% of the domestic milk supply is represented through FARM.[23]

84.     As part of its mission, FARM publishes detailed standards for the care of animals at participating farms.[24]   Routine practices at Fair Oaks Farms, as documented during the ARM investigation, failed to meet even the most rudimentary standards of care as promoted by FARM. For instance, instead of branding newborn calves without any modicum of pain relief (in addition to beating them with brands or burning their faces in retribution), FARM standards explicitly require pain mitigation for branding.   Instead of housing calves in barren, filthy hutches beneath a scorching sun, FARM standards require that calving areas are "clean, soft, dry . . . and well-ventilated."   Where Fair Oaks Farms workers dragged, yanked, and brutally threw calves, FARM standards mandate the movement of calves with "properly designed mechanical transport devices." And instead of allowing sick or injured downer cows to languish and suffer, FARM standards require that "non-ambulatory animals are provided prompt medical care."[25]

85.     Both Fair Oaks Farms internal protocol and the FARM program failed to stop the abuse and torture of animals described herein.   In fact, the FARM programs' lack of adequate oversight enabled the abuse and torture described herein.

86.     In addition to the above systematic animal abuse, it is common practice at all of

---

[22] Farmers Assuring Responsible Management, *What is FARM?*, https://nationaldairyfarm.com/what-is-farm/ (last visited June 24, 2020).

[23] Jeff Daniels, *Alleged animal abuse at Indiana farm, undercover video putting 'ag-gag' laws in spotlight*, NBR (June 13, 2019), http://nbr.com/2019/06/13/alleged-animal-abuse-at-indiana-farm-undercover-video-putting-ag-gag-laws-in-spotlight/ (last visited June 24, 2020).

[24] Farmers Assuring Responsible Management, Animal Care Reference Manual, Version 4.0 Abbreviated, https://nationaldairyfarm.com/wp-content/uploads/2020/02/Animal-Care-V4-Manual-Print-Friendly.pdf (last visited June 24, 2020).

[25] *Id.*

Defendants' milk suppliers to sell cows no longer able to produce optimal quantities of milk to slaughter. Defendants know or should know that this transport, handling, and slaughter is done by unaccountable individuals and occurs at facilities that do not purport to and do not provide "extraordinary" care and comfort for cows. In short, Defendants treat their cows as disposable widgets once they are of no further use to them as milk machines. Whatever (manifestly inadequate) efforts Defendants take to ensure "extraordinary" care and comfort for its cows ends entirely once the cows are unable to satisfy Defendants' unnatural and physically injurious milk production expectations.

87. It was and continues to be routine practice at fairlife's milk suppliers to sell male calves to veal operations, where the calves are confined to filthy, tiny crates for their entire, short, and brutal lives before being sent to slaughter. These facilities do not provide "extraordinary" care or comfort for these calves that Defendants' caused to be born and intentionally place into such horrific conditions.

88. As a result of the ARM investigation, the Newton County Sheriff's Office (Indiana) launched an investigation of its own. Newton County prosecutors have filed criminal charges against three individuals for animal cruelty and torturing or mutilating a vertebrate animal (which is a felony).

89. On June 6, 2019, fairlife issued a statement acknowledging the ARM investigation, admitting the truth of its allegations, and apologizing for its failure to ensure that the dairy cows which produce fairlife Products were treated humanely. [F]airlife stated that it was "devastated by the abuse that was recently discovered at Fair Oaks Farms." It also indicated it was discontinuing the use of milk from Fair Oaks Farms, increasing animal-welfare

requirements, and seeking further audits by industry representatives.[26]  The Coca-Cola website previously referenced these events.

90.     Coca-Cola recognizes that its success "depends in large part on our ability to maintain brand image of our existing products, build up brand image for new products and brand extensions, and maintain our corporate reputation and social license to operate."[27]  Coca-Cola also recognizes that "campaigns by activists . . . could adversely impact our corporate image and reputation."[28]  Accordingly, Coca-Cola has a strong incentive to address the negative publicity surrounding its fairlife brand created as  a result of the release of ARM's investigation and also to develop greater oversight than it had been previously investing in ensuring that representations concerning the Products are accurate.

91.     Coca-Cola, for its part, stated that it "expect[s] all [its] suppliers to operate with the highest degree of integrity and comply with all laws, including animal welfare laws" and stated that it was "taking steps to ensure that internationally recognized animal welfare standards are appropriately embedded into our Sustainable Agriculture Guiding Principles, our Supplier Guiding Principles, and our auditing processes."[29]

92.     However, some or all of the abuse that Mike McCloskey admitted to have taken

---

[26] This is from the version of the fairlife website available on June 12, 2019, according to the Wayback Machine, *available at* https://web.archive.org/web/20190612170753/https://fairlife.com/news/fairlife-statement-regarding-arm-video/ (last visited June 24, 2020).

[27] Coca-Cola 2019 Annual 10k at 18, *available at* https://investors.coca-colacompany.com/filings-reports/annual-filings-10-k.

[28] *Id.*

[29] This is from the version of the Coca-Cola website available on June 7, 2019, according to the Wayback Machine, *available at* https://web.archive.org/web/20190607155428/https://www.coca-colacompany.com/press-center/company-statements/coca-cola-company-statement-regarding-fair-oaks-farms (last visited June 24, 2020).

place on fairlife's "flagship farm" will continue to occur on this and other dairy operations that produce dairy milk for the Products. Defendants' assurances that no such abuse will occur again and purported actions to ensure their promise are nothing more than window dressing and will not stop the kinds of animal abuse uncovered by ARM.

93.     Additionally, this type of abuse and maltreatment described above was not limited to those specific incidents documented by the ARM investigators at Fair Oaks. Instead, these and other abuses were and are common occurrences at other facilities associated with fairlife milk Products.

94.     On July 23, 2019, ARM released the results of another of its undercover investigation focused on Natural Prairie Organic Dairy ("NPOD") located in Channing, Texas.[30] According to ARM, NPOD supplies dairy directly to fairlife and is owned by Donald DeJong, a member of the fairlife Board of Directors and Vice Chairman of Select Milk Producers, Inc.[31]

95.     ARM's investigator worked at NPOD for nearly one month "using a manure vacuum and scraper to clean the feces in the cow holding barns."[32] The Investigator used surveillance equipment to capture the normal daily practices on the farm.[33]

96.     ARM's investigator found ongoing, systemic, and egregious acts of animal cruelty. Daily or commonplace practices included:

---

[30] Press release announcing Natural Prairie Organic Dairy investigation, https://animalrecoverymission.org/wp-content/uploads/2019/07/CHICAGO-FINAL-1.pdf (last visited June 24, 2020).

[31] *Id.*

[32] The results of ARM's undercover investigation are available at https://animalrecoverymission.org/wp-content/uploads/2019/07/NPD-Report.pdf (last visited June 24, 2020).

[33] *Id.*

a. Repeatedly beating cows to get up;[34]

b. Stabbing cows with screwdrivers;

c. Pulling and dragging cows by the head with front loaders; picking them up by the bucket and driving them to a holding area to be sold for slaughter;

d. Leaving sick cows to die slowly in barns with management's knowledge, which sometimes took longer than a day;

e. Allowing cows to fall into cesspools such that they risked drowning;

f. Failing to provide veterinary care to cows with flesh wounds, eye gashes, infections and/or leg injuries;

g. Providing inadequate euthanasia by gunshot which did not result in instant death causing the cows and calves to suffer for hours prior to death.

97. ARM's investigator undercover video is 6 minutes and 12 seconds in duration.[35] The following footage contains the most egregious content:

a. Dropping a newborn calf on a concrete floor;

b. Flaming a cow (passing a large flame beneath dairy cows to burn off the hair from udders) immediately after giving birth;

c. Restraining a cow and twisting its head upward with a rope;

d. Kicking a cow;

e. Tying up a downer cow;

---

[34] Downer cows are disabled cows that are unable to get up for more than 24 hours. *See The low-down on 'down cows'*, https://veterinary-practice.com/article/the-low-down-on-down-cows (last visited June 24, 2020).

[35] The video footage of ARM's undercover investigation is available at https://animalrecoverymission.org/operation-natural-prairie-undercover-footage/ (last visited June 24, 2020).

     f.      Kicking a downer cow multiple times;

     g.     Stabbing a cow with screw drivers;

     h.     Hitting a cow with a shovel;

     i.       Dragging a cow by head with a front loader;

     j.       Tying a cow into the bucket of a front loader;

     k.     Dragging a cow by rope around its head.

98.    The ARM Investigator never observed disciplinary action in response to any employee for animal abuse. Knowledge of the abuse was known by and among the workers, forepersons, and upper management at all levels of Natural Prairie Organic Dairy. There were several instances where the abuse warranted law enforcement notification, but they were never contacted.

99.    The supervisors failed to provide reasonable care and medical treatment for sick and injured cows contrary to fairlife's claims.

100.    The ARM investigator also documented dead calves and cows at a dumpsite at Natural Prairie Organic Dairy.

101.    Another ARM investigation targeted Strauss Veal Feeds in Manchester, Indiana and was released on August 13, 2019.

102.    Straus Veal Feeds was identified as part of the June 4 investigation. During this investigation at Fair Oaks Farms, Fair Oaks constantly stated to ARM that it did not sell bull calves to the veal market. ARM subsequently investigated and found that bull calves from Fair Oaks Farm are transported to Midwest Veal, owned by Strauss Veal. Not only were they hiding this practice of selling the calves to slaughter, but the Strauss Veal Feeds investigation uncovered that these calves, the offspring of the fairlife dairy cows, were treated just as inhumanely and

violently as at the Fair Oaks Farm and the NPOD farm.[36] During ARM's investigation of Strauss Veal, the investigator documented calves being thrown and abused, kept in tiny, cramped crates in total darkness for up to 18 hours per day, and deprived of proper veterinary care.[37]

**Defendants Cannot Substantiate the Labeling Claims As Abuse is Pervasive at fairlife Milk Supplier Farms**

103.     The undercover ARM investigations demonstrate a troubling theme with fairlife's suppliers and members of the Select Milk cooperative: despite representations about humane treatment, Defendants take little to no effort to ensure that these promises are actually followed.

104.     Of the approximately 30 farms that produce milk for fairlife, most, if not all, are members of Select Milk.  Select Milk is a cooperative of approximately 99 dairy producers based in Artesia, New Mexico.  Select Milk was co-founded by Mike McCloskey.  Mike McCloskey has served as CEO of Select Milk.[38]

105.     Members of Select Milk share experiences, common practices, and insider information with each other.

106.     Of the approximately 30 Select Milk dairy operations that supply milk for fairlife, some are located in the Midwest (Indiana, Illinois, Ohio, Michigan, and/or other adjacent states) and others are located in the Southwestern United States (Texas, New Mexico, Oklahoma, and/or other adjacent states).

---

[36] The results of ARM's undercover investigation are available at https://animalrecoverymission.org/wp-content/uploads/2019/08/Operation-Strauss-Veal-Feeds-.pdf (last visited June 24, 2020).

[37] Discussion of ARM's undercover investigation is available at https://animalrecoverymission.org/operations/factory-farm-division/operation-strauss-veal-feeds/ (last visited June 23, 2020).

[38] *See* Washington Post Live, *Mike McCloskey: Co-Founder and CEO, Select Milk Producers*, https://www.washingtonpost.com/postlive/mike-mccloskey/2012/06/27/gJQAegjADY_story.html?noredirect=on (last visited June 24, 2020).

107. [F]airlife operates several facilities where the Products are processed. In addition to a facility in Coopersville, Michigan, Defendants operated, and may still operate, a processing facility in Dexter, New Mexico (plant code 35-0306) to produce the Products. Defendants also have a facility in Waco, Texas and one under construction in Goodyear, Arizona.[39]

108. These processing facilities source milk for the Products from Select Milk members.

109. [F]airlife maintains an office at a dairy operation located in Dexter, New Mexico. This dairy operation is nothing like Defendants' "flagship farm" in Indiana, and in no way provides cows with the "extraordinary" care and comfort that Defendants' promise in the Animal Welfare Promises.

110. Public records show that as early as 2015 Defendants were sourcing, and may still source, milk for the Products from several industry-standard feedlots in the Southwestern United States where Defendants' Animal Welfare Promises are not practiced. This includes, but is not be limited to, the following dairy operations (with Plant/BTU numbers in parenthesis): Sideline (35-19), Sideline #2 (35-24), 3V (35-45), Dan Dee (35-56), Woodcrest (35-22), Arroyo (35-26), Vaz (35-38), Visser (35-42), Double Aught (35-59), P7 LLC (35-36), P7 LLC #2 (35-21), Organ Dairy (35-53). Each of these farms is in relatively close proximity to Dexter, New Mexico, where fairlife maintains a significant commercial presence.

111. Instead of the "extraordinary" care and comfort promised by Defendants, the cows at these and similar dairy operations are left exposed to the elements (including during

---

[39] *See* Dave Fusaro, *Coca-Cola Buys All of Fairlife Dairy Products*, Food Processing (Jan. 6, 2020), https://www.foodprocessing.com/industrynews/2020/coca-cola-buys-all-of-fairlife/ (last visited June 24, 2020).

extreme weather events such as deadly heat waves and blizzards) on industry-standard confined animal feeding operations that are categorically unable to meet the Animal Welfare Promises.

*Satellite Image of fairlife's location in Dexter, New Mexico:*



112.    As the above image shows, Defendants maintain and source from facilities that differ markedly from the "flagship farm" that Defendants hold out as representative of their "extraordinary" cow care and comfort.  Each of the dairy operations listed two paragraphs above are substantially similar in their inability and failure to meet the Animal Welfare Promises.

113.    Cows housed at these and other dairy operations supplying milk for the Products do not experience the "extraordinary"  humane cow care and comfort that Defendants represent to their customers, such as temperature control, clean and comfortable beds, individualized veterinary care, and other claims that are not reasonably possible given the layout and structure of these facilities.  Instead, cows are kept on dirt and manure covered feed lots, without the benefits promised in the Animal Welfare Promises.

114.   In addition to dairy operations that are structurally unable to provide the "extraordinary" humane cow care and comfort as promised by Defendants, other Select Milk members in the Southwest engage in egregious animal cruelty like that uncovered by ARM's investigators at fairlife's "flagship" farm in Indiana.

115.   As discussed above, Animal Rescue Mission conducted another undercover investigation of a Select Milk dairy operation from March to July of 2019, this time located in Channing, Texas.[40]   The ARM investigator uncovered egregious animal abuse, similar to that documented in ARM's previously released investigations.   Cows were kicked, prodded with screwdrivers, and beaten when too weak to move; cows were left to suffer from injuries and other painful maladies; calves were cruelly pulled from their mothers moments after birth and thrown into bins and then confined alone to tiny hutches; cows were left to wallow in their own feces, blood, and urine; and cows had their abdomens cut open to install "portholes."

116.   ARM's investigator reported that this dairy operation is riddled with camera surveillance, but the documented abuse was rampant anyway.

117.   Adding camera surveillance at Select Milk dairy operations will not stop the types of systematic abuse of cows and calves uncovered by the numerous ARM investigations.

118.   The site of this additional ARM investigation, Natural Prairie organic dairy farm, is owned by Donald DeJong.   Donald DeJong is affiliated with fairlife and the McCloskeys.   In

---

[40] Video released by ARM documenting this "organic" Select Milk member's systemic abuse of their cows can be found at https://vimeo.com/349554589 (last visited June 18, 2020).

addition to his roles at fairlife and Select Milk,[41] DeJong is also affiliated with DeJong Family Farms, a dairy operation located near Fair Oaks, Indiana that produces milk used in the Products.

119.    Like other Select Milk farms, Natural Prairie organic dairy has participated in the FARM program and used by fairlife to purportedly ensure proper animal care on its producer farms.

120.    The FARM program, which requires only baseline industry standards, failed to ensure even these rudimentary animal welfare standards were followed much less the "extraordinary" cow care and comfort promised by Defendants, as exposed by ARM's investigations and Defendants' own statements.

**Animal Welfare and Defendants' Animal Welfare Promises Are Material to Consumers**

121.    Meat and dairy companies increasingly make representations and promises about providing high quality and humane animal-welfare in connection with their products, because they have discovered that those representations and promises increase sales, allow them to charge higher prices, or both.   Animal-welfare representations and promises are profitable, because consumers care about the treatment of the animals that their food comes from. Consumers are more likely to buy a product, and will pay more for it, if the animals it comes from were treated humanely.

122.    Numerous studies conducted by third parties have confirmed the fact that animal welfare matters to consumers.

123.    In one survey published in 2010, 68% of consumers agreed or strongly agreed

---

[41] *Our Family Farm*, Natural Prairie Dairy, https://naturalprairiedairy.com/our-story/ (last visited June 24, 2020).

they would like to know more about "ways [farmers] ensure animal care."[42]  That was the second-highest rate of agreement, behind only "measures used to produce safe food."

124.    Another 2010 study found "that consumers desire high standards of animal care, even if it raises food prices and involves government regulation."[43]

125.    A study published by the Animal Humane Association in 2014, indicated that concerns may be increasing among consumers.  For instance, it found that 94.9% of survey participants "stated they were very concerned about farm animal welfare," up from 89% the year before.  Similarly, "75.7% stated that they were very willing to pay more for humanely raised meat, dairy and eggs," which was an increase from 74% the year before.  Additionally, the most important labeling attribute to consumers was "humanely raised," including over labels such as "antibiotic free," "natural," and "organic."[44]

126.    Walmart announced in 2015 that its own research showed that 77% of its shoppers would increase their trust of, and 66% would increase their likelihood to shop at, a retailer that improved the treatment of livestock.[45]

127.    One 2018 survey found that 77% of consumers were concerned about animal

---

[42] *What "Indicator Consumers" Want to Know Most About How U.S. Foods Are Produced*, SEGMENTrak (June 2010), *available at* https://cdn.brownfieldagnews.com/wp-content/uploads/2010/04/REVFINAL.SegmenTrakExecSummary.4.28.10.pdf (last visited June 24, 2020).

[43] RW Prickett et al., *Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of US Households*, Animal Welfare (Aug. 2010), *available at* https://www.ingentaconnect.com/contentone/ufaw/aw/2010/00000019/00000003/art00015 (last visited June 24, 2020).

[44] *2014 Humane Heartland Farm Animal Welfare Survey*, *available at* https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf (last visited June 24, 2020).

[45] Christine M. Boynton, *Wal-Mart's Push on Animal Welfare Hailed as Game Changer*, Fox 5 News, https://foxbaltimore.com/news/local/wal-mart39s-push-on-animal-welfare-hailed-as-game-changer (last visited June 24, 2020).

welfare as it relates to their food, more than 66% of consumers paid some or a lot of attention to food labels regarding how the animal was raised, and over 70% of retailers stocking products with humane claims reported increased sales.[46]

128.    Finally, a 2015 Consumer Reports survey found that consumers deem it important that food not be produced via standard factory-farm methods with an overwhelming 84% of food shoppers indicating that it was "important" or "very important" to "provid[e] better living conditions for animals."[47]

129.    [F]airlife itself has acknowledged the importance of animal welfare to its consumers.  In an interview conducted after public revelation of animal abuse at Fair Oaks Farms, fairlife COO Tim Doelman stated that "this whole company . . . [is] built on great animal welfare."[48]

130.    Accordingly, fairlife's marketing of its Products as humanely treating the animals used to produce the Products is material to the reasonable consumer.  Reasonable consumers would not expect that Products labeled with the promises by fairlife discussed herein would be produced through inhumane treatment of animals as described above, nor would those consumers expect that—after making the Animal Welfare Promises—fairlife and Defendants would fail to ensure the ethical treatment of all of their dairy cows (especially the ones at the

---

[46] Alicia Kelso, *Consumers Are Willing to Pay a Premium for Animal Welfare Certifications*, Grocery Dive (July 17, 2018), https://www.grocerydive.com/news/grocery--consumers-are-willing-to-pay-a-premium-for-animal-welfare-certifications/533852/ (last visited June 24, 2020).

[47] CONSUMER REPORTS NATIONAL RESEARCH CENTER, *Natural Food Labels Survey*, *available at* https://article.images.consumerreports.org/prod/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf at 3.

[48] *fairlife COO Speaks Out After Release of Undercover Videos*, NBC Chicago (June 7, 2019), https://www.nbcchicago.com/multimedia/web-fairlife-coo-interview_Chicago-510995412.html (last visited June 24, 2020).

"flagship farm").

131.    The marketplace's reaction to the public revelation of animal abuse at Fair Oaks Farms further demonstrates the importance to consumers of humane animal treatment. Numerous retailers stopped or suspended selling the Products as a result of the animal abuse.

132.    Customers pay a premium expecting not only that the Products they are purchasing are made by dairy cows that are treated humanely, but also by partnerships and companies that ensure their promises for the ethical and humane treatment of animals are followed at all of the farms that supply the fairlife Products.

133.    Defendants' failure to ensure that its Animal Welfare Promises were followed *even at the flagship farm* demonstrate that consumers who purchased fairlife Products did not receive the benefit of their bargain—that the company would ensure that any consumers who purchase fairlife Products can be confident that they are supporting a business that ensures the humane and ethical treatment of their dairy cows.  It is thus unnecessary for consumers to demonstrate that every drop of milk in each of their purchased Products was produced by a beaten, sick,  dying or otherwise mistreated cow; Defendants' failure to live by their promises as it concerns the flagship farm is sufficient.

## **CLASS ACTION ALLEGATIONS**

134.    Pursuant to Rules 23(b)(2), (b)(3), and, as applicable, (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit on behalf of themselves and the following Class of individuals:

> All persons who purchased Defendants' fairlife Products within the United States (the "Nationwide Class").

135.    Pursuant to Rules 23(b)(2), (b)(3), and, as applicable, (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs also bring causes of action, as listed herein, on behalf of Nationwide Class.

136.    Additionally, as further descried herein, Plaintiffs bring claims based upon state consumer protection laws on behalf of the following subclasses for the states of California, Connecticut, Florida, Georgia, Illinois, Maryland, Michigan, Minnesota, Missouri, New York, Pennsylvania, Texas, Virginia, Wisconsin:

> All persons who purchased Defendants' fairlife or Products in that particular state or commonwealth.

137.    Excluded from the above Class and subclasses are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are those who purchased the Products for resale; all persons who make a timely election to be excluded from the Class; and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

138.    **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable.  Defendants have sold many thousands of units of the Products to Class members.

139. **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether the representations discussed herein that Defendants made about the Products were or are true, misleading, or likely to deceive a reasonable consumer;

    b.    Whether Defendants exercised any control, oversight, or otherwise routinely inspected farms that sourced milk for their Products to ensure that the representations they made concerning the humane treatment of animals were true;

    c.    Whether the representations discussed herein were material to a reasonable consumer;

    d.    Whether Defendants engaged in false or misleading advertising;

    e.    Whether Defendants' conduct constitutes violations of the laws asserted herein;

    f.    Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

    g.    Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

140. **Typicality:** Plaintiffs' claims are typical of those of the other Class members because, among other things, Plaintiffs and all Class members were comparably injured through the uniform conduct described herein.

141. **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

142. **Declaratory and Injunctive Relief:** Defendants have acted or refused to act on

grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

143. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for class members to individually seek redress for Defendants' wrongful conduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS

### FIRST CLAIM FOR RELIEF
**Breach of Express Warranty**
*By All Plaintiffs Against All Defendants*

144. Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

145. Each of the named Plaintiffs bring this cause of action against Defendants on behalf of the Nationwide Class and, in the alternative, state subclasses based upon the states in which they purchased fairlife Products.

146. The laws of the states in which Plaintiffs purchased fairlife Products are substantially similar so as to warrant certification of a Nationwide Class or, in the alternative, the certification of state subclasses as to particular elements of Plaintiffs' breach of warranty claims.

147. Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description. *See, e.g.*, Cal. Com. Code § 2313(1)(a)-(b); Fla. Stat. Ann. § 672.313(1)(a)-(b); Ga. Code Ann. § 11-2-313(1)(a)-(b); 810 ICLS 5/2-313(1)(a)-(b); Ind. Code Ann. § 26-1-2-313(1)(a)-(b); Md. Code Ann. § 2-313(1)(a)-(b); Mich. Comp. Laws Ann. § 440.2313(1)(a)-(b); Minn. Stat. Ann. § 336.2-313(1)(a)-(b); Mo. Ann. Stat. § 400.2-313(1)(a)-(b); N.Y. U.C.C. Law § 2-313(1)(a)-(b); 13 Pa. Stat. and Cons. Stat. Ann. § 2313(a)(1)-(2); Tex. Bus. & Com. Code Ann. § 2.313(a)(1)-(2); Va. Code Ann. § 8.2-313(1)(a)-(b); Wis. Stat. Ann. § 402.313(1)(a)-(b). Other state laws are substantially similar to warrant certification of the Nationwide Class.

148. Each of the Plaintiffs formed a contract with fairlife, the McCloskey Defendants, and Coca-Cola and Select Milk—by virtue of their joint venture in creating fairlife—at the time they purchased the Products. The terms of that contract include the promises and affirmations of fact that Defendants make on the Products' packaging and through marketing and advertising, including the Animal Welfare Promises described above and the very name of the Products, "fairlife." The marketing and advertising constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class members on the one hand, and the Defendants, on the other.

149. In addition, or in the alternative, to the formation of an express contract,

51

Defendants made each of their above-described representations, including the Animal Welfare Promises and name of the Products as "fairlife," to induce Plaintiffs and Class members to rely on such representations.

150. Defendants Animal Welfare Promises were material, and Plaintiffs and Nationwide Class members did rely and were reasonable in relying upon such representations in making their purchases of the Products.

151. [F]airlife, Coca-Cola, Select Milk and the McCloskey Defendants have breached their express warranties about the Products because the representations set forth herein, including the Animal Welfare Promises and express representations concerning how Defendants ensure the humane treatment of livestock, are false and misleading. They are false and misleading because Defendants could not live up to the promises made by the very name of the Products themselves, "fairlife," or the promises of "[e]xtraordinary care and comfort for our cows," that the dairy farms from which products are sourced "provide extraordinary animal care," that "exceptional care [is] taken every step of the way," among other Animal Welfare Promises made on each and every label of the Products.

152. Defendants utterly failed to ensure that the material representations they were making to consumers were true. As a result of this systemic failure of oversight to ensure the truthfulness of the representations of every Product label, consumers purchased Products from a company that sourced dairy from farms that mistreated their dairy cows in violation of the express agreement that it created with its consumers.

153. Defendants could not make Animal Welfare Promises to consumers because they could not verify whether those promises were accurate. Nor did they enforce these promises through adequate oversight. Accordingly, Defendants charged consumers a price premium for

express—but empty—promises.

154.    [F]airlife, Coca-Cola, Select Milk, and the McCloskey Defendants breached their express warranties about the Products because the representations as set forth herein were false and misleading.

155.    Plaintiffs and Nationwide Class members expected and would have been reasonable in expecting that Defendants' ensured the statements on the Products' labels were truthful such that dairy cows were treated humanely when purchasing fairlife Products; accordingly, they did not receive the benefit of their bargain when they discovered that at least some of Defendants' dairy cows were abused, neglected, and treated in a cruel and inhumane manner evidencing a lack of oversight.

156.    On April 29, 2020, a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and the other members of the Nationwide Class, sent a notice letter to Defendants, which provided notice of Defendants' breach and demanded that Defendants correct, repair, replace, or otherwise rectify the breach complained of herein.

157.    Defendants also have notice of the breaches as set forth herein by virtue of news reports concerning animal abuse at Select Milk facilities.

158.    As a result of Defendants' breaches of their express warranties, Plaintiffs and the Nationwide Class members were damaged in the amount of the price they purchased for the Products, or in an amount equal to the price premium that they paid when they purchased the Products, in an amount to be proven at trial.

159.    Plaintiffs, on behalf of themselves and class members, pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**

*By All Plaintiffs Against All Defendants*

160.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

161.    Plaintiffs bring this claim for unjust enrichment against Defendants in the alternative to their breach of express warranty claim.

162.    Plaintiffs and Nationwide Class members conferred benefits on Defendants by purchasing the Products, including by paying a price premium for the Products.

163.    Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs and the Nationwide Class members' purchases of the Products.  Retention of the monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the Nationwide Class members because they would not have purchased or would have paid less for the Products if they had known the true facts.

164.    Select Milk retained a benefit despite not ensuring that it lived up to its promises, including providing "extraordinary animal care and comfort" to the dairy cows that produce milk for fairlife Products.

165.    Coca-Cola retained a benefit despite not exercising adequate oversight over operations that source dairy for the fairlife Products.

166.    [F]airlife retained a benefit through the profits it retained in spite of its failure to ensure that dairy cows are treated humanely in sourcing milk Products.

167.    The McCloskey Defendants retained a benefit despite their promises to consumers about the fair, ethical, and humane treatment of dairy cows.

168.    Because Defendants' retention of the non-gratuitous benefits conferred on them

by Plaintiffs and the Nationwide Class members is unjust and inequitable, Plaintiffs and the Nationwide Class members seek restitution of all monies Defendants acquired from their unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

169.    Therefore, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
**Violation of Georgia's Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. § 10-1-370, *et seq.***
*By All Plaintiffs Against Coca-Cola*
*By Plaintiff Jones on Behalf of the Georgia Subclass Against All Defendants*

170.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

171.    All Plaintiffs bring this cause of action against Defendant Coca-Cola on behalf of the Nationwide Class.  Plaintiff Jones also bring this cause of action on behalf of herself and the Georgia Subclass.

172.    Under Georgia's Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.* ("GUDTPA"):

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

. . .

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ;

. . .

(7) Represents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;

. . .

(9) Advertises goods or services with intent not to sell them as advertised;

. . . or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Ga. Code Ann. § 10-1-372(a)(5), (7), (9), (12).

173.     Coca-Cola engaged in deceptive trade practices in violation of the GUDTPA, including the following:

i.     representing that goods have characteristics and/or benefits that they do not have (*e.g*., that the animals which are used to create the Products are treated humanely), Ga. Code Ann. § 10-1-372(a)(5);

ii.     representing that goods are of a particular standard, quality, or grade if they are of another (*e.g*., that the Products were produced from humanely-treated animals), Ga. Code Ann. § 10-1-372(a)(7);

iii.     advertising goods with intent not to sell them as advertised (*e.g*., advertising that the Products would be derived from humanely-treated animals when they were not), Ga. Code Ann. § 10-1-372(a)(9); and

iv.     engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding, as discussed herein, Ga. Code Ann. § 10-1-372(a)(12).

174.     The misrepresentations and material omissions described in the preceding paragraph were material and made intentionally and knowingly with the intent that Plaintiffs and Class members rely upon them in connection with purchasing the Products.

175.     The misrepresentations and material omissions as alleged herein were created in and disseminated from Coca-Cola's headquarters located in Georgia.    Additionally, any oversight obligations that Coca-Cola had emanated from its headquarters in Georgia.

176.     At all times relevant hereto, Coca-Cola owned a substantial portion of fairlife, and directed its marketing and representations concerning the humane treatment of dairy cows used to make the Products, which were in the Animal Welfare Promises and brand name "fairlife" on

each and every label of the Products.

177.    Coca-Cola made these misrepresentations and material omissions directly with respect to Plaintiffs and Class members and by way of transactions involving the Products.

178.    Coca-Cola knew or was reckless in not knowing about its misrepresentations and material omissions regarding the treatment of animals associated with the Products.

179.    Coca-Cola's deceptive and unfair acts and practices were likely to and did in fact deceive the public at large as well as their customers—both across the United States and in the State of Georgia—who paid materially more for the Products because of Coca-Cola's misrepresentations and material omissions regarding the treatment of animals associated with the Products.

180.    Coca-Cola's misrepresentations and omissions were material because consumers were willing to, and in fact did, pay more for the Products based upon misrepresentations and omissions regarding the treatment of animals associated with the Products.

181.    All Defendants are responsible for misrepresentations concerning the humane treatment of dairy cows in the creation of the fairlife Products, as described herein, in transactions by consumers within the State of Georgia.

182.    Plaintiffs and Class members relied and were reasonable in relying upon the misrepresentations and omissions to their detriment, and they did not receive the benefit of their bargains in purchasing Products.

183.    Had Plaintiffs and the Class members known of the misrepresentations and omissions, they either would not have purchased the Products or would have paid significantly less for them.

184.    Defendants acted intentionally, knowingly, and maliciously to violate the

GUDTPA and recklessly disregarded the promises they made to Plaintiffs and Class members. Defendants acts and practices affect the consumer marketplace and public interest, because they had a direct impact upon pricing of the Products at issue, competitors' products, and consumers' purchasing decisions.

185.    As a direct and proximate result of Defendants' violations of the GUDTPA, Plaintiffs and Class members suffered injury in fact, as described herein.

186.    Pursuant to section 10-1-373 of the GUDTPA, Plaintiffs and Class members seek declaratory relief, injunctive relief, attorneys' fees and costs, and any other relief that the Court deems necessary and proper.

187.    Therefore, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Violation of Georgia's Fair Business Practices Act of 1975,**
**Ga. Code Ann. § 10-1-390,** *et seq.*
*By All Plaintiffs Against Coca-Cola*
*By Plaintiff Jones on Behalf of the Georgia Subclass Against All Defendants*

188.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

189.    All Plaintiffs bring this cause of action against Defendant Coca-Cola on behalf of the Nationwide Class.  Plaintiffs Jae Jones and Jenny Rossano bring this cause of action on behalf of themselves and the Georgia Subclass.

190.    Plaintiffs bring this claim against Coca-Cola nationwide and Plaintiffs Jones and Rossano bring this claim against all Defendants for violation of Georgia's Fair Business Practices Act of 1975, Ga. Code Ann. § 10-1-390 *et seq.* ("GFBPA").

191.    Plaintiffs bring this claim for the public benefit, to promote the public interests in the provision of truthful, fair information to allow consumers and the public at large to make

informed decisions about their purchasing choices related to food products, and to protect the public from the Coca-Cola and Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and unlawful practices described herein.

192.    Defendants are engaged in, and their acts and omissions affect, trade and commerce under Georgia Code section 10-1-392(28).

193.    Defendants are engaged in "consumer acts or practices," which are defined as "acts or practices intended to encourage consumer transactions" under Georgia Code section 10-1-392(7).

194.    Defendants' acts, practices, and omissions at issue in this matter were directed at Product purchasers in Georgia, and Coca-Cola's actions emanated from its headquarters in Georgia.

195.    Defendants engaged in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" in violation of Georgia Code section 10-1-393(a). Those acts and practices include those expressly declared unlawful by Georgia Code section 10-1-393(b), such as:

      i.    representing that goods have characteristics that they do not have (*e.g.*, that the animals which are used to create the Products are treated humanely);

      ii.    representing that goods are of a particular standard, quality, or grade if they are of another (*e.g.*, that the Products were produced from humanely-treated animals); and

      iii.    advertising goods with intent not to sell them as advertised (*e.g.*, advertising that the Products would be derived from humanely-treated animals when they were not).

196.    In addition, Defendants engaged in the unfair and deceptive acts and practices described herein that, while not expressly declared unlawful by Georgia Code section 10-1-

393(b), are prohibited by Georgia Code section 10-1-393(a).

197.    Defendants engaged in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce [which] are . . . unlawful," including:

> i.    deceptively advertising that the Products are derived from humanely-treated animals;
>
> ii.    including language on the Products stating that animals associated with the Products are treated humanely and calling the Products "fairlife," promising that the animals are living a fair and humane life;
>
> iii.    using "false exemplar" farms, with conditions that were designed to mislead consumers about the actual living conditions and treatment of animals associated with the Products;
>
> iv.    promising consumers that auditing processes were used to monitor living conditions of animals associated with the Products;
>
> v.    making false and misleading statements, including material omissions, as described throughout this complaint.

198.    The misrepresentations and material omissions described in the preceding paragraph were material and made intentionally and knowingly with the intent that Plaintiffs and Class members rely upon them in connection with purchasing the Products—by all Defendants with the intent that Georgia consumers rely upon the misrepresentations, and by Coca-Cola for consumers nationwide.

199.    Defendants made these misrepresentations and material omissions directly with respect to Plaintiffs and Class members and by way of transactions involving the Products.

200.    Defendants knew or were reckless in not knowing about their misrepresentations and material omissions regarding the treatment of animals associated with the Products.

201.    Defendants' deceptive and unfair acts and practices were likely to and did in fact deceive the public at large as well as their customers—who are Georgia Subclass members—

who paid materially more for the Products because of the Defendants' misrepresentations and material omissions regarding the treatment of animals associated with the Products.

202.　Coca-Cola's deceptive and unfair acts and practices were likely to and did in fact deceive the public at large as well as their customers—nationwide—who paid materially more for the Products because of the Coca-Cola's misrepresentations and material omissions regarding the treatment of animals associated with the Products.

203.　Defendants' misrepresentations and omissions were material because consumers were willing to and in fact did pay more for the Products based upon Defendants' misrepresentations and omissions regarding the treatment of animals associated with the Products.

204.　Plaintiffs and Class members relied and would be reasonable in relying upon Defendants' misrepresentations and omissions to their detriment, and they did not receive the benefit of their bargains in purchasing Products.

205.　Had Plaintiffs and Class members known of Defendants' misrepresentations and omissions, they either would not have purchased the Products or would have paid significantly less for them.

206.　Defendants acted intentionally, knowingly, and maliciously to violate the GFBPA and recklessly disregarded the promises they made to Plaintiffs and Class members. Defendants' acts and practices affect the consumer marketplace and public interest, because they had a direct impact upon pricing of the Products at issue, competitors' products, and consumers' purchasing decisions.

207.　As a direct and proximate result of Defendants' violations of GUDTPA, Plaintiffs and Class members suffered injury in fact, as described herein.

208.    The GFBPA permits any person who suffers injury or damages as a result of the violation of its provisions to bring an action against the person or persons engaged in such violations.  Ga. Code Ann. § 10-1-399(a).

209.    Pursuant to Georgia Code section 10-1-399(b), Plaintiffs, represented by the undersigned, provided Defendants with a written demand for relief describing the unfair or deceptive practice described herein. More than 30 days have elapsed, and Defendants have not made written tender of settlement.

210.    Pursuant to section 10-1-399(a) of the GFBPA, on behalf of the Class, Plaintiffs seek actual damages, declaratory relief, injunctive relief, rescission, pre-judgment interest, exemplary damages, attorney's fees and costs, and any other relief that the Court deems necessary and proper as again Coca-Cola nationwide, and as against all Defendants for purchases in the State of Georgia.

211.    Therefore, Plaintiffs pray for relief as set forth below.

### FIFTH CLAIM FOR RELIEF
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS 505/1, *et seq.***
*By All Plaintiffs Against fairlife*
*By Plaintiff Diana Tait on Behalf of the Illinois Subclass Against All Defendants*

212.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

213.    All Plaintiffs bring this cause of action against Defendant fairlife on behalf of the Nationwide Class.  Alternatively, Plaintiff Diana Tait brings this cause of action on behalf of herself and the Illinois Subclass.

214.    Plaintiff asserts that the Defendants violated Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"), which prohibits the use of

"unfair and deceptive practices" in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate that purpose.

215. Plaintiff Tait and the Class and Illinois Subclass members are consumers as defined in 815 ILCS 505/1(c) and (e).

216. Defendants intended that Plaintiffs and the Class members would rely upon their deceptive conduct, including the Animal Welfare Promises and brand name "fairlife," and a reasonable person would in fact be misled by this deceptive conduct.

217. Defendants' misconduct, including the misrepresentations and the omission of material facts, took place in the course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals located in Illinois.

218. [F]airlife's activities and actions—in particular, its misrepresentations and omissions regarding the humane treatment of animals and its actions regarding marketing of the fairlife products—emanated from the State of Illinois.

219. By undertaking the conduct at issue herein, the Defendants have engaged in unfair or deceptive acts prohibited by the ICFA.

220. If not for the Defendants' deceptive and unfair acts, including Defendants' false and misleading Animal Welfare Promises and branding of the Products as "fairlife" as alleged herein, Plaintiffs and the Nationwide Class and Illinois Subclass members would not have purchased the Products or would have paid significantly less for them.

221. Defendants, at all relevant times, knew or should have known that Plaintiffs and the Nationwide Class and Illinois Subclass members did not know and could not have reasonably discovered their deceptive and unfair acts, including their false and misleading Animal Welfare Promises and branding of the Products as "fairlife," prior to their purchases of the Products.

222.     As a direct and proximate result of Defendants' violations of the ICFA, Plaintiffs and the Nationwide Class and Illinois Subclass members sustained damages in an amount to be proven at trial.

223.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that on account of Defendants' conduct, Plaintiffs and the Nationwide Class and Illinois Subclass members seek statutory and actual damages, punitive damages, injunctive relief, attorneys' fees and costs, and all other relief allowed under the ICFA.

224.     Therefore, Plaintiffs pray for relief as set forth below.

### SIXTH CLAIM FOR RELIEF
**Violation of Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS § 510/2, *et seq.***
*By All Plaintiffs Against fairlife*
*Plaintiff Tait on Behalf of the Illinois Subclass Against All Defendants*

225.     Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

226.     Plaintiffs assert this cause of action individually and on behalf of the Nationwide Class against fairlife, and Plaintiff Tait asserts this cause of action individually and on behalf of the Illinois Subclass.

227.     Defendants are "persons" as defined by 815 ILCS §§ 510/1(5).

228.     Defendants engaged in deceptive trade practices in the conduct of their business, in violation of 815 ILCS §§ 510/2(a), including knowingly manufacturing, advertising, and selling Products with Animal Welfare Promises and the brand name "fairlife" while knowing that those promises are not true, that Defendants are unable to keep or enforce those promises, and did not have adequate protocols, oversight, or control in place to ensure that those promises are kept to consumers.

229.     [F]airlife's and Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

230.     The above unfair and deceptive practices and acts by fairlife and Defendants were immoral, unethical, oppressive, and unscrupulous.   These acts caused substantial injury to Plaintiffs and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

231.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

232.     Plaintiffs are entitled to such injunctive relief to ensure that the Products conform to the Animal Welfare Promises and the brand name "fairlife" that Defendants made about the Products.

233.     Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

## SEVENTH CLAIM FOR RELIEF
**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code Ann. § 24-5-0.5-0.1, *et seq.***
*By All Plaintiffs Against the McCloskey Defendants*

234.     Plaintiffs reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

235.     All Plaintiffs bring this cause of action against the McCloskey Defendants on behalf of the Nationwide Class.

236.     Plaintiffs bring this claim on behalf of the Class members for violation of the

Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-0.1, *et seq*.

237.    Under the Indiana Deceptive Consumer Sales Act, the term "consumer transaction" means:

> [A] sale . . . of an item of personal property . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things.

Ind. Code Ann. § 24-5-0.5-2(a)(1).

238.    Under the Indiana Deceptive Consumer Sales Act, the term "supplier" means, in relevant part:

> A seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions . . . . The term includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer.

Ind. Code Ann. § 24-5-0.5-2(a)(3)(A).

239.    Defendants are each a "supplier" with the meaning of Indiana Code section 24-5-0.5-2(a)(3)(A) because they are each a seller who regularly engages in or solicits sales of items of personal property (including the Products) to persons, including Plaintiffs, for purposes that are primarily personal, familial, or household.  Nationwide Class members also purchased the Products for primarily personal, familiar, or household purposes.

240.    Under the Indiana Deceptive Consumer Sales Practices Act:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Ind. Code Ann. § 24-5-0.5-3(a).

241.    Defendants violated Indiana Code section 24-5-0.5-3(a) by engaging in the unfair,

66

abusive, and/or deceptive acts discussed herein, including the false and misleading Animal Welfare Promises and branding of the Products as "fairlife."

242.    Under the Indiana Deceptive Consumer Sales Practices Act:

(b) Without limiting the scope of subsection (a), the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

Ind. Code Ann. § 24-5-0.5-3(b)(1)-(2).

243.    Defendants violated Indiana Code section 24-5-0.5-3(a) and (b)(1) by making representations, including the Animal Welfare Promises discussed herein and branding of the Products as "fairlife," that the Products had characteristics and/or benefits they did not have. Defendants knew or should have reasonably known these representations, including the Animal Welfare Promises and name "fairlife," were false and misleading.

244.    Defendants violated Indiana Code section 24-5-0.5-3(a) and (b)(2) by making representations, including the Animal Welfare Promises and name "fairlife" discussed herein, that the Products were of a particular standard, quality, grade, style, or model, even though the representations were false and misleading and Defendants knew or should reasonably have known they were false and misleading.

245.    Specifically to the McCloskey Defendants, they made representations on the Products' labels, themselves, and—as alleged herein—those representations bore the signature of Mike McCloskey and Sue McCloskey.

246.     Defendants' conduct was willful or in reckless disregard of the rights of Plaintiffs and the Class members under the Indiana Deceptive Consumer Sales Act.

247.     Defendants' conduct proximately caused injuries to Plaintiffs and the members.

248.     Plaintiffs and the Class members reasonably relied on upon Defendants' misrepresentations, including the false and misleading Animal Welfare Promises and name "fairlife" discussed herein.

249.     Defendants' deceptive acts were done as part of a scheme, artifice, or device with intent to defraud or mislead and constitute incurable deceptive acts under the Indiana Deceptive Consumer Sales Act.

250.     On account of Defendants' violations of the Indiana Deceptive Consumer Sales Act, Plaintiffs and the Class members seek statutory damages, reasonable attorney's fees, costs of suit, treble damages, an order enjoining Defendants' unlawful practices, and such further relief as the Court deems just and proper.

251.     On account of the McCloskey Defendants' violations as described herein, Plaintiffs and the Class members seek damages on a nationwide basis for those actions and activities of the McCloskey Defendants that emanated from the State of Indiana.

252.     Therefore, Plaintiffs pray for relief as set forth below.

### CLAIMS BROUGHT ON BEHALF OF THE STATE SUBCLASSES

### EIGHTH CLAIM FOR RELIEF
**Violation of California's Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq.***
*By Plaintiff Cantwell on Behalf of the California Subclass Against All Defendants*

253.     Plaintiff Carol Cantwell reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

254.     Plaintiff Cantwell brings this claim on behalf of the California Subclass against

the Defendants for violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. (the "CLRA").

255. The Products are "goods" within the meaning of California Civil Code section 1761(a), and the purchases of such Products by Plaintiff Cantwell and the California Subclass members constitute "transactions" within the meaning of California Civil Code section 1761(e).

256. California Civil Code section 1770(a)(2) prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services." By marketing the Products with the Animal Welfare Promises and name "fairlife," Defendants have represented and continue to represent that the Products are derived from humanely raised cows when they are not. Therefore, Defendants have violated section 1770(a)(2) of the CLRA.

257. California Civil Code section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." By marketing the Products with the Animal Welfare Promises and name "fairlife," Defendants have represented and continue to represent that the Products have characteristics (are derived from humanely raised cows) that they do not have. Therefore, Defendants have violated section 1770(a)(5) of the CLRA.

258. California Civil Code section 1770(a)(7) prohibits "[r]espresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the Products with the Animal Welfare Promises and name "fairlife," Defendants have represented and continue to represent that the Products are of a particular standard or quality (from humanely raised cows) when they are of another. Therefore, Defendants have violated section 1770(a)(7) of the CLRA.

259. California Civil Code section 1770(a)(9) prohibits "[a]dvertising goods or

services with intent not to sell them as advertised." By marketing the Products with the Animal Welfare Promises and name "fairlife," and then not ensuring the truthfulness of the representations, Defendants have violated section 1770(a)(9) of the CLRA.

260. Defendants have also violated the CLRA by intentionally failing to disclose material information about the Products, such as the fact that Defendants' promises regarding the humane treatment of dairy cows and other Animal Welfare Promises, including the name "fairlife." are empty, not enforced, and that Products have been derived from cows that are or have previously been systematically abused and mistreated.

261. At all relevant times, Defendants have known or reasonably should have known that their Animal Welfare Promises and branding of the Products as "fairlife," were inaccurate; consumers purchased the Products based upon guarantees that Defendants' dairy cows were treated in accordance with Animal Welfare Promises and lived a "fair" life. Consumers justifiably relied upon Defendants' promises based upon the packaging on the Products, themselves, and Defendants made those promises because they would drive sales of the Products.

262. Accordingly, the promises and representations are material, because reasonable consumers would rely upon them when making purchases of the Products. Because of the materiality of the representations, reliance may be inferred on behalf of the class members.

263. Plaintiff Cantwell and the California Subclass members have suffered and continue to suffer injuries caused by Defendants because they would not have purchased the Products or would have paid significantly less for the Products had they known that Defendants' conduct was misleading and fraudulent.

264. Plaintiff Cantwell seeks monetary damages pursuant to California Civil Code

section 1782.  On or about April 29, 2020 and May 21, 2020, Plaintiff Cantwell sent Defendants a Notice and Demand Letter, notifying Defendants of their violations of the CLRA.  Defendants did not correct the misrepresentations or misconduct identified in the demand letter.

265.     Under California Civil Code section 1780(a), Plaintiff Cantwell and the California Subclass members also seek injunctive relief pursuant to the CLRA, preventing the Defendants from further wrongful acts and unfair and unlawful business practices.

266.     Therefore, Plaintiff Cantwell prays for relief as set forth below.

**NINTH CLAIM FOR RELIF**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
*By Plaintiff Cantwell on Behalf of the California Subclass Against All Defendants*

267.     Plaintiff Carol Cantwell reasserts the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

268.     Plaintiff Cantwell brings this claim on behalf of the California Subclass against Defendants for violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL").

269.     California's FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public. . . in any advertising device. . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  Cal. Bus. & Prof. Code § 17500.

270.     Defendants have represented and continue to represent to the public, including Plaintiff Cantwell and the California Subclass members, through Defendants' deceptive packaging and marketing, that the Products are made with milk from humanely raised cows.

Defendants' representations are false and misleading because the Products do not contain milk from humanely raised cows. Because Defendants have disseminated false and misleading information regarding the Products, and Defendants know, knew, or should have known through the exercise of reasonable care that the representations are and continue to be false and misleading, Defendants have violated the FAL.

271.    Defendants' conduct is also misleading because they fail to disclose material information about the Products, such as the fact that, in spite of explicit representations and marketing, the Products have been created using dairy cows that have been abused and mistreated.

272.    Defendants' advertising and Product labels give consumers the false impression that Defendants' oversight would ensure that their Products are not nor have they been created using dairy cows that were mistreated.

273.    As a result of Defendants' false advertising, Defendants have fraudulently obtained and continue to fraudulently obtain money from Plaintiff Cantwell and the California Subclass members.

274.    Plaintiff Cantwell requests that this Court cause Defendants to restore this fraudulently obtained money to Plaintiff Cantwell and the members of the California Subclass, to disgorge the profits the Defendants made on these transactions, and to enjoin Defendants from violating the FAL or violating it in the same fashion in the future as discussed herein. Plaintiff Cantwell and the California Subclass members may be irreparably harmed and/or denied an effective and complete remedy if the Court does not grant such an order.

275.    Therefore, Plaintiff Cantwell prays for relief as set forth below.

### TENTH CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, *et seq.*
Unlawful, Unfair, and Fraudulent Prongs**
*By Plaintiff Cantwell on Behalf of the California Subclass Against All Defendants*

276.     Plaintiff Carol Cantwell reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

277.     Plaintiff Cantwell bring this claim on behalf of the California Subclass against Defendants for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL").

278.     The UCL provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

279.     Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law.

280.     Defendants' misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA, the FAL, and other applicable laws as described herein.

281.     As a result of Defendants' unlawful business acts and practices, Defendants have unlawfully obtained money from Plaintiff Cantwell and the California Subclass members.

282.     Under the UCL, a business act or practice is "unfair" if the defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

283.     Defendants' conduct was and continues to be of no benefit to purchasers of the

Products, as it is misleading, unfair, unlawful, and is injurious to consumers who rely on the Products' packaging and marketing. Creating consumer confusion as to the welfare of the animals used to derive the Products is of no benefit to consumers. Therefore, Defendants' conduct was and continues to be "unfair."

284.    As a result of Defendants' unfair business acts and practices, Defendants have unfairly obtained and continue to unfairly obtain money from Plaintiff Cantwell and the California Subclass members.

285.    Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

286.    Defendants' conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that Defendants have methods to ensure the ethical and humane treatment of the animals from which they sources dairy for the Products.  In reality, if Defendants were able to ensure that its Animal Welfare Promises and branding of the Products as "fairlife" were truthful and accurate, four undercover investigations would not have revealed systematic abuse at its facilities. Defendants' conduct is also fraudulent because Defendants fail to disclose material information about the Products, such as the fact that the milk has been derived from cows that were systematically abused and mistreated.

287.    Because Defendants misled Plaintiff Cantwell and the California Subclass members, Defendants' conduct was "fraudulent."

288.    As a result of Defendants' fraudulent business acts and practices, Defendants have fraudulently obtained and continue to fraudulently obtain money from Plaintiff Cantwell and the California Subclass members.

289.    Plaintiff Cantwell requests that this Court cause Defendants to restore this

unlawfully, unfairly, and fraudulently obtained money to Plaintiff Cantwell and the California Subclass members, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from violating the UCL or violating it in the same fashion in the future as discussed herein. Plaintiff Cantwell and the California Subclass members may be irreparably harmed and/or denied an effective and complete remedy if the Court does not grant such an order.

290. Therefore Plaintiff Cantwell pray for relief as set forth below.

## ELEVENTH CLAIM FOR RELIEF
**Violation of Connecticut Unfair Trade Practice Act**
**C.G.S.A. § 42-110,** *et seq.*
*By Plaintiff Hamilton on Behalf of the Connecticut Subclass Against All Defendants*

291. Plaintiff Karai Hamilton reasserts the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

292. Plaintiff Hamilton asserts this claim individually and on behalf of the Connecticut Subclass.

293. Defendants are "persons" as defined by C.G.S.A. § 42-110a(3).

294. Defendants are engaged in "trade" or "commerce" as those terms are defined by C.G.S.A. § 42-110a(4).

295. At the time of filing this Complaint, Plaintiff Hamilton sent notice to the Attorney General and Commissioner of Consumer Protection pursuant to C.G.S.A. § 42-110g(c). Plaintiff Hamilton will provide a file-stamped copy of the Amended Complaint to the Attorney General and Commissioner of Consumer Protection.

296. Defendants advertised, offered, or sold goods or services in Connecticut, and engaged in trade or commerce directly or indirectly affecting the people of Connecticut.

297. Defendants engaged in deceptive acts and practices and unfair acts and practices

in the conduct of trade or commerce, in violation of the C.G.S.A. § 42-110b, including: (i) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; (ii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (iii) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

298.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

299.    Defendants intended to mislead Plaintiff Hamilton and the Connecticut Subclass members and induce them to rely on their misrepresentations and omissions.

300.    Had Defendants disclosed to Plaintiff Hamilton and Connecticut Subclass members that their uniform Animal Welfare Promises and branding of the Products as "fairlife" were false, Defendants would have been unable to continue in business and would have been forced to disclose that they are unable to guarantee that they kept their promises. Instead, Defendants made empty promises. Plaintiff Hamilton and the Connecticut Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

301.    Defendants acted intentionally, knowingly, and maliciously to violate the Connecticut Unfair Trade Practices Act, and recklessly disregarded Plaintiff Hamilton's and Connecticut Subclass members' rights. Defendants knew that they were unable to guarantee that they could not keep the Animal Welfare Promises they made without adequate oversight, auditing, and control.

302.    As a direct and proximate result of Defendants' deceptive acts and practices,

Plaintiff Hamilton and Connecticut Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

303. Defendants' deceptive acts and practices caused substantial, ascertainable injury to Plaintiff Hamilton and Connecticut Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

304. Defendants' violations of Connecticut law were done with reckless indifference to the rights of Plaintiff Hamilton and the Connecticut Subclass or was with an intentional or wanton violation of those rights.

305. Plaintiff Hamilton and the Connecticut Subclass request damages in the amount to be determined at trial, including statutory and common law damages, attorneys' fees, and punitive damages, under Rules 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

306. Therefore, Plaintiff Hamilton prays for relief as set forth below.

**TWELFTH CLAIM FOR RELIEF**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. Ann. § 501.201, *et seq.***
*By Plaintiff Jenny Rossano on Behalf of the Florida Subclass Against All Defendants*

307. Plaintiff Jenny Rossano reassert the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

308. Plaintiff Rossano brings this claim on behalf of the Florida Subclass against Defendants for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq.* ("FDUTPA").

309. FDUTPA provides that "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. Ann. § 501.204.

310.    By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of FDUTPA.

311.    Defendants' misrepresentations and omissions regarding the Animal Welfare Promises and name "fairlife" are material facts that a reasonable person would have considered in deciding whether to purchase (or to pay the same price for) the Products.

312.    Defendants intended that Plaintiff and the Florida Subclass members would rely upon their deceptive conduct, including the Animal Welfare Promises and name "fairlife," and that conduct has deceived Plaintiffs and has deceived or is likely to deceive members of the consuming public and the Florida Subclass members.

313.    In addition to being deceptive, the business practices of Defendants were unfair, because the injuries to Plaintiffs and the Florida Subclass members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the Florida Subclass members or to competition under all of the circumstances. Moreover, the injury is not one Plaintiffs and the Florida Subclass members could have reasonably avoided.

314.    Plaintiff and the Florida Subclass members justifiably acted or relied to their detriment upon Defendants' misrepresentations (and related omissions of fact), as evidenced by Plaintiff and the Florida Subclass members' purchases of the Products.

315.    If not for Defendants' deceptive and unfair acts, including Defendants' false and misleading Animal Welfare Promises and branding of the Products as "fairlife" as alleged herein, Plaintiffs and the Florida Subclass members would not have purchased the Products or would have paid significantly less for them.

316.    As a direct and proximate result of these unfair and deceptive commercial practices, Plaintiff and the Florida Subclass members have been damaged and seek actual damages, attorneys' fees and costs, and all other relief allowed under FDUTPA.

317.    Therefore, Plaintiff Rossano prays for relief as set forth below.

**THIRTEENTH CLAIM FOR RELIEF**
**Violation of Maryland's Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101, *et seq.***
*By Plaintiff Michelle Ingrodi on Behalf of the Maryland Subclass Against All Defendants*

318.    Plaintiff Michelle Ingrodi reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

319.    Plaintiff Ingrodi brings this claim on behalf of the Maryland Subclass against Defendants for violation of Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.*

320.    Under Maryland's Consumer Protection Act, "[a] person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services; (2) [t]he offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services . . . ." Md. Code Ann., Com. Law § 13-303(1)-(2).

321.    Under Maryland's Consumer Protection Act, "consumer goods" means, respectively, "goods . . . which are primarily for personal, household, family, or agricultural purposes." *Id.* § 13-101(d)(1).

322.    Under Maryland's Consumer Protection Act, "consumer" means "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." *Id.* § 13-101(c)(1).

323.    Plaintiff Ingrodi and the Maryland Subclass members are "consumers" under

Maryland's Consumer Protection Act because they purchased the Products primarily for personal, household, or family purposes.

324.    To bring an action under the Maryland Consumer Protection Act, a plaintiff must allege (1) an unfair or deceptive trade practice that (2) is relied upon, and (3) causes the plaintiff actual injury.

325.    Under Maryland's Consumer Protection Act, unfair, abusive, or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

. . . or

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

(3) Failure to state a material fact if the failure deceives or tends to deceive;

. . .

(5) Advertisement or offer of consumer goods, consumer realty, or consumer services: (i) Without intent to sell, lease, or rent them as advertised or offered . . . [or]

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods, consumer realty, or consumer service . . . .

Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i).

326.    In violation of Maryland's Consumer Protection Act, Defendants engaged in

unfair, abusive, or deceptive trade practices because Defendants made material misrepresentations and omissions upon which Plaintiff Ingrodi and the Maryland Subclass members relied, causing them financial injury.

327. Defendants engaged in unfair, abusive, or deceptive trade practices including but not limited to the following:

      i.      making false and misleading representations regarding the Products that have the capacity, tendency, or effect of deceiving or misleading consumers, as discussed herein, including the Animal Welfare Promises;

      ii.     representing that goods have characteristics and/or benefits that they do not have (*e.g.*, that the animals which are used to create the Products are treated humanely);

      iii.    representing that goods are of a particular standard, quality, or grade if they are of another (*e.g.*, that the Products were produced from humanely-treated animals);

      iv.    advertising goods with intent not to sell them as advertised (*e.g.*, advertising that the Products would be derived from humanely-treated animals when Defendants could not ensure that they were, and where concrete examples exist showing that they were not); and

      v.    making deceptive representations regarding the Products as discussed herein, including the Animal Welfare Promises, with the intent that consumers rely on the same in connection with the promotion or sale of the Products.

328. The misrepresentations and material omissions described in the preceding paragraph were material and made intentionally and knowingly with the intent that Plaintiff Ingrodi and the Maryland Subclass members rely upon them in connection with purchasing the Products.

329. Defendants made these misrepresentations and material omissions directly with respect to Plaintiff Ingrodi and the Maryland Subclass members and by way of transactions involving the Products.

330.    Defendants knew or were reckless in not knowing about their misrepresentations and material omissions regarding the treatment of animals associated with the Products.

331.    Defendants' deceptive and unfair acts and practices were likely to and did in fact deceive the public at large as well as their customers—who are Maryland Subclass members— who paid materially more for the Products because of Defendants' misrepresentations and material omissions regarding the treatment of animals associated with the Products.

332.    Defendants' misrepresentations and omissions were material because consumers were willing to and in fact did pay more for the Products based upon Defendants' misrepresentations and omissions regarding the treatment of animals associated with the Products.

333.    Plaintiff Ingrodi and the Maryland Subclass members relied and would be reasonable in relying upon Defendants' misrepresentations and omissions to their detriment, and they did not receive the benefit of their bargains in purchasing Products.

334.    Had Plaintiff Ingrodi and the Maryland Subclass members known of Defendants' misrepresentations and omissions, they either would not have purchased the Products or would have paid significantly less for them.

335.    Defendants acted intentionally, knowingly, and maliciously to violate the Maryland Consumer Protection Act and recklessly disregarded the Animal Welfare Promises and branding of the Products as "fairlife" that they made to Plaintiff Ingrodi and the Maryland Subclass members. Defendants' acts and practices affect the consumer marketplace and public interest, because they had a direct impact upon pricing of the Products at issue, competitors' products, and consumers' purchasing decisions.

336.    Plaintiff Ingrodi and the Maryland Subclass members seek an Order declaring that

Defendants' conduct described above violated Maryland's Consumer Protection Act and an award of damages pursuant to the Consumer Protection Act compensating them for the purchase price, or alternatively the price premium, they paid in reliance on Defendants' material misrepresentations and omissions when they purchased the Products. Md. Code Ann., Com. Law § 13-408(b).

337.    Pursuant to Maryland's Consumer Protection Act, Plaintiff Ingrodi seeks reasonable attorney's fees and costs. Md. Code Ann., Com. Law § 13-408(b).

338.    On behalf of herself and the members of the Maryland Subclass, Plaintiff Ingrodi also seeks such further relief as this Court may deem just and proper.

339.    Therefore, Plaintiff Ingrodi prays for relief as set forth below.

**FOURTEENTH CLAIM FOR RELIEF**
**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws Ann. § 445.901, *et seq.***
*By Plaintiff Peters on Behalf of the Michigan Subclass Against All Defendants*

340.    Plaintiff Cindy Peters reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

341.    Plaintiff Peters brings this claim on behalf of the Michigan Subclass against Defendants for violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*

342.    Defendants offered and sold goods in Michigan and engaged in "trade or commerce" directly or indirectly affecting the people of Michigan, as defined by Michigan Compiled Laws section 445.902(g).

343.    As detailed herein, Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Michigan Compiled Laws section 445.903(1) by:

i.      representing that their goods have characteristics, uses, and benefits that they do not have, Mich. Comp. Laws Ann. § 445.903(1)(c);

ii.     representing that their goods are of a particular standard or quality if they are of another, Mich. Comp. Laws Ann. § 445.903(1)(e);

iii.    advertising or representing goods with intent not to dispose of those goods as advertised or represented, Mich. Comp. Laws Ann. § 445.903(1)(g);

iv.    making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, Mich. Comp. Laws Ann. § 445.903(1)(bb); and

v.     failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, Mich. Comp. Laws Ann. § 445.903(1)(cc).

344.   Defendants' representations and omissions in Defendants' Animal Welfare Promises, in the name "fairlife," and elsewhere were material because they were likely to deceive reasonable consumers.

345.   Defendants' Animal Welfare Promises and branding of the Products as "fairlife" were deceptive and misleading because—despite making promises regarding the ethical treatment of dairy cows used to make fairlife Products—Defendants could not keep those promises based upon examples from the ARM investigations discussed above.

346.   As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Peters and the Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

347.   Plaintiff Peters and the Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and any other relief

that the Court deems just and proper.

348.    Therefore, Plaintiff Peters prays for relief as set forth below.

## FIFTEENTH CLAIM FOR RELIEF
### Violation of the Missouri Merchandising Practices Act,
### Mo. Ann. Stat. § 407.010, *et seq.*
*By Plaintiffs French and Mallory on Behalf of the Missouri Subclass Against All Defendants*

349.    Plaintiffs Debra French and Kaye Mallory reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

350.    Plaintiffs French and Mallory bring this claim on behalf of the Missouri Subclass against Defendants for violation of the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010, *et seq.* ("MMPA").

351.    Under the MMPA, the term "merchandise" means "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Ann. Stat. § 407.010(4).

352.    The Products are goods and, consequently, are "merchandise" as the MMPA defines that term.

353.    Under the MMPA:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice.

Mo. Ann. Stat. § 407.020(1).

354.    As set forth herein, Defendants' conduct in connection with the advertising, marketing, sale, distribution, and offering of the Products violates section 407.020(1) in that, among other things, Defendants have used and continue to use deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact.

355. As set forth herein, Defendants' deceptive acts, unfair practices, misrepresentations, and concealment of material facts include, among other things, misrepresenting the Products as being derived from cows that were treated humanely, when, in fact, Defendants could not guarantee that they are not, contrary to Defendants' Animal Welfare Promises and branding of the Products as "fairlife."

356. Defendants' conduct further violates the MMPA pursuant to state regulation 15 C.S.R. § 60-8.010, *et seq.* because the conduct: (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) was unfair; and (6) is unconscionable.

357. Because Defendants used deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the concealment, suppression, or omission of material facts in connection with the advertising, marketing, sale, distribution, and offering of the Products, Plaintiffs French and Mallory and the Missouri Subclass members suffered economic damages.

358. Plaintiffs French and Mallory and the Missouri Subclass members seek actual damages; a declaration that Defendants' acts, use, or employment of deceptions, frauds, false pretenses, false promises, misrepresentations, unfair practices, or concealments, suppressions, or omissions of material facts violate the MMPA; an injunction prohibiting Defendants from continuing to engage in such unlawful acts, use, or employment; restitution; rescission; pre-judgment interest; punitive damages; attorneys' fees and costs; and any other relief that the Court deems necessary and proper.

359. Therefore, Plaintiffs French and Mallory pray for relief as set forth below.

## SIXTEENTH CLAIM FOR RELIEF
### Violation of Minnesota's Prevention of Consumer Fraud Act,
### Minn. Stat. Ann. § 325F.68, *et seq.*
*By Plaintiff Connie Sandler on Behalf of the Minnesota Subclass Against All Defendants*

360.     Plaintiff Connie Sandler reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

361.     Plaintiff Sandler brings this claim on behalf of the Minnesota Subclass against Defendants for violation of Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.*

362.     Minnesota Statutes section 325F.69, subdivision 1, makes it unlawful for any person to use "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."

363.     Defendants' business practices, in advertising, marketing, and selling the Products as described herein constitute the use of fraud, false pretense, false promises, misrepresentations, misleading statements, and deceptive practices and, thus, constitute multiple, separate violations of Minnesota Statutes section 325F.69.

364.     By engaging in the conduct described herein, Defendants violated and continue to violate Minnesota Statutes section 325F.69, subdivision 1.

365.     Defendants' wrongful conduct and use of false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others relied on those statements, includes, by way of example and not by limitation:

      a.      Defendants' fraudulent, misleading, and deceptive statements and practices relating to the Products;

      b.      Defendants' warranty-related misconduct, including their fraudulent, deceptive, and unfair practice of misrepresenting the

Products' characteristics;

c.     Defendants' concealment of the true characteristics of the Products; and

d.     Defendants' continued sale of the Products after they knew about the misleading representations.

366.    Defendants' omissions and misrepresentations set forth herein are material in that they relate to information that would naturally affect the purchasing decision or conduct of purchasers, including Plaintiff Sandler and the Minnesota Subclass members, regarding whether to purchase the Products.

367.    Had Plaintiff Sandler and the Minnesota Subclass members known that Defendants' Products were not derived from cows that were guaranteed to be treated humanely, as Defendants had promised, or that Defendants did not have adequate oversight to ensure that their representations were accurate or followed, they would not have purchased the Products at a premium price.

368.    Defendants fraudulently, negligently, recklessly, and/or intentionally concealed and/or failed to disclose the true characteristics of the Products for the purpose of inducing Plaintiff Sandler and the Minnesota Subclass members to rely thereon, and Plaintiff Sandler and the Minnesota Subclass members justifiably relied, to their detriment, upon the truth and completeness of Defendants' Animal Welfare Promises, branding of the Products as "fairlife," and other representations about the Products. Plaintiff Sandler and the Minnesota Subclass members relied on Defendants to disclose all material facts and not omit any material information regarding the Products. That Plaintiff Sandler and the Minnesota Subclass members were deceived is evidenced by the fact that Plaintiff Sandler and the Minnesota Subclass members purchased the Products. Had they known the truth, Plaintiff Sandler and the Minnesota

Subclass members would not have bought the Products. Defendants' fraudulent and deceptive practice of advertising, marketing, and selling the Products repeatedly occurred in Defendants' trade or business and was capable of deceiving a substantial portion of the purchasing public.

369. Where, as here, Plaintiff Sandler's claims inure to the public benefit as Defendants have misrepresented the qualities and characteristics of the Products to the public at large, Minnesota's private-attorney general statute, Minnesota Statutes section 8.31, subdivision 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

370. As a result of Defendants' fraud, false pretense, false promises, misrepresentations, misleading statements, and deceptive practices relating to the sale of the Products, Plaintiff Sandler and the Minnesota Subclass members have suffered actual damages in that they would not have purchased the Products at a premium price if they had known that the representations at issue regarding the Products, including the Animal Welfare Promises, are false and misleading.

371. Plaintiff Sandler and the Minnesota Subclass members will continue to suffer injury if Defendants' deceptive conduct is not enjoined, including but not limited to the purchase price of the Products and/or the premium paid for the Products.

372. As a direct, proximate, and foreseeable result of Defendants' violation of the statute, Plaintiff Sandler and the Minnesota Subclass members sustained damages.

373. Therefore, Plaintiff Sandler prays for relief as set forth below.

## SEVENTEENTH CLAIM FOR RELIEF
### Violation of Minnesota's Unlawful Trade Practices Act,
### Minn. Stat. Ann. § 325D.09, *et seq.*
*By Plaintiff Sandler on Behalf of the Minnesota Subclass Against All Defendants*

374.    Plaintiff Connie Sandler reassert the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

375.    Plaintiff Sandler brings this claim on behalf of the Minnesota Subclass against Defendants for violation of Minnesota's Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09 *et seq.*

376.    Minnesota Statutes section 325D.13 provides that "[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

377.    By engaging in the conduct described herein, Defendants violated and continue to violate Minnesota Statutes section 325D.13.

378.    Where, as here, Plaintiff Sandler's claims inure to the public benefit as Defendants have misrepresented the qualities and characteristics of the Products to the public at large, Minnesota's private-attorney general statute, Minnesota Statutes section 8.31, subdivision 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

379.    Defendants' wrongful conduct and misrepresentation of the true qualities of the Products includes, by way of example and not by limitation:

      a.    Defendants' fraudulent, misleading, and deceptive statements and practices relating to the Products;

      b.    Defendants' warranty-related misconduct, including their fraudulent, deceptive, and unfair practice of misrepresenting the

Products' characteristics;

c.    Defendants' concealment of the true characteristics of the Products; and

d.    Defendants' continued sale of the Products after they knew about the misleading representations.

380.    Defendants and their agents and distributors also misrepresented the true characteristics of the Products by making the various statements about the alleged qualities and characteristics of the Products as stated above.

381.    As a result of Defendants' practices relating to misrepresentation of the true characteristics of the Products, Plaintiff Sandler and the Minnesota Subclass members have suffered actual damages in that they would not have purchased the Products at a premium price if they had known that the representations at issue regarding the Products, including the Animal Welfare Promises and branding the Products as "fairlife," are false and misleading.

382.    As a direct, proximate, and foreseeable result of Defendants' violation of the statute, Plaintiff Sandler and the Minnesota Subclass members sustained damages.

383.    Therefore, Plaintiff Sandler prays for relief as set forth below.

**EIGHTEENTH CLAIM FOR RELIEF**
**Violation of Minnesota's Uniform Deceptive Trade Practices Act,**
**Minn. Stat. Ann. § 325D.43, *et seq.***
*By Plaintiff Connie Sandler on Behalf of the Minnesota Subclass Against All Defendants*

384.    Plaintiff Connie Sandler reassert the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

385.    Plaintiff Sandler brings this claim on behalf of the Minnesota Subclass against Defendants for violation of Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43 *et seq.*

386.    Minnesota Statutes section 325D.44, subdivision 1, provides, in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ;
>
> . . .
>
> (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
>
> (9) advertises goods or services with intent not to sell them as advertised;
>
> . . . ; or
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

387.    By engaging in the conduct described herein, Defendants violated and continue to violate each of the provisions of Minnesota Statutes section 325D.44, subdivision 1, set forth above.

388.    Where, as here, Plaintiff Sandler's claims inure to the public benefit as Defendants have misrepresented the qualities and characteristics of the Products to the public at large, Minnesota's private-attorney general statute, Minnesota Statutes section 8.31, subdivision 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

389.    Defendants' wrongful conduct and misrepresentation of the true characteristics, standards, quality, and grade of the Products includes, by way of example and not by limitation:

> a.    Defendants' fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality and grade of

the Products;

b.    Defendants' fraud and misrepresentation of information about the characteristics of the Products, and Defendants' knowledge of those misrepresentations, and

c.    Defendants' concealment of the true characteristics of the Products.

390.    Defendants and their agents and distributors also misrepresented the true characteristics of the Products by misrepresenting the alleged qualities and characteristics of the Products as stated above.

391.    As a result of Defendants' practices relating to misrepresentation of the true characteristics of the Products, Plaintiff Sandler and the Minnesota Subclass members have suffered actual damages in that they would not have purchased the Products at a premium price if they had known that the representations at issue regarding the Products, including the Animal Welfare Promises and branding of the Products as "fairlife," are false and misleading.

392.    As a direct, proximate, and foreseeable result of Defendants' violation of the statute, Plaintiff Sandler and the Minnesota Subclass members sustained damages.

393.    Therefore, Plaintiff Sandler prays for relief as set forth below.

### NINETEENTH CLAIM FOR RELIEF
**Violation of Minnesota's False Statement in Advertisement Act,**
**Minn. Stat. Ann. § 325F.67**
*By Plaintiff Connie Sandler on Behalf of the Minnesota Subclass Against All Defendants*

394.    Plaintiff Connie Sandler reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

395.    Plaintiff Sandler brings this claim on behalf of the Minnesota Subclass against Defendants for violation of Minnesota's False Statement in Advertisement Act, Minn. Stat. Ann. § 325F.67.

396.    Minnesota Statutes section 325F.67 provides, in part:

Any person, firm, corporation, or association who, with intent to sell . . . merchandise, . . . to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, . . . makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of . . . label, price tag, . . . or in any other way, an advertisement of any sort regarding merchandise, . . . or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

397.    By engaging in the conduct described herein, Defendants violated and continue to violate Minnesota Statutes section 325F.67.

398.    Where, as here, Plaintiff Sandler's claims inure to the public benefit as Defendants have misrepresented the qualities and characteristics of the Products to the public at large, Minnesota's private-attorney general statute, Minnesota Statutes section 8.31, subdivision 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

399.    Defendants' untrue, deceptive, and misleading assertions and representations about the Products include, by way of example and not by limitation:

a.    Defendants' fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of the Products;

b.    Defendants' fraud and misrepresentation of information about the characteristics of the Products and Defendants' knowledge of those misrepresentations; and

c.    Defendants' concealment of the true characteristics of the Products.

400. Defendants and their agents and distributors also made untrue, deceptive, and misleading assertions and representations about the Products by making the various statements about the alleged characteristics of the Products referenced herein.

401. As a result of Defendants' untrue, deceptive, and misleading assertions and representations about the Products, Plaintiff Sandler and the Minnesota Subclass members have suffered actual damages in that they would not have purchased the Products at a premium price if they had known that representations at issue regarding the Products, including the Animal Welfare Promises and branding of the Products as "fairlife," are false and misleading.

402. Plaintiff Sandler and the Minnesota Subclass members seek to enjoin Defendants from untrue, deceptive, and misleading assertions and representations about the Products.

403. Therefore, Plaintiff Sandler prays for relief as set forth below.

**TWENTIETH CLAIM FOR RELIEF**
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,**
**N.Y. Gen. Bus. Law § 349**
*By Plaintiff Rothberg on Behalf of the New York Subclass Against All Defendants*

404. Plaintiff David Rothberg reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

405. Plaintiff Rothberg brings this claim on behalf of the New York Subclass against Defendants for violation of New York General Business Law section 349.

406. Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

407. Defendants' labeling and marketing of the Products, as alleged herein, constitute "deceptive" acts and practices, as such conduct misled Plaintiff Rothberg and the New York

Subclass members as to whether the cows used to create Defendants' Products are treated humanely, in accordance with Defendants' representations; and, further, whether Defendants have the oversight in place to ensure that the cows used to create Defendants' Products are treated humanely, or whether Defendants' promises are empty.

408. In accordance with subsection (h) of section 349, Plaintiff Rothberg seeks an order enjoining Defendants from continuing these unlawful deceptive acts and practices. Absent enjoining these unlawful deceptive acts and practices, Defendants will continue their false and misleading marketing of the Products and, in doing so, irreparably harm each of the New York Subclass members.

409. As a consequence of Defendants' deceptive acts and practices, Plaintiff Rothberg and the New York Subclass members suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Rothberg and the New York Subclass members also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. Gen. Bus. Law § 349(h).

410. Therefore, Plaintiff Rothberg prays for relief as set forth below.

### <u>TWENTY-FIRST CLAIM FOR RELIEF</u>
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act,
N.Y. Gen. Bus. Law § 350**
*By Plaintiff Rothberg on Behalf of the New York Subclass Against All Defendants*

411. Plaintiff David Rothberg reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

412. Plaintiff Rothberg brings this claim on behalf the New York Subclass against Defendants for violation of New York General Business Law section 350.

413. Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350.

414.    New York General Business Law section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a. The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." *Id*.

415.    Defendants' labeling, marketing, and advertising of the Products, as alleged herein, are "misleading in a material respect," and thus "false advertising," as they falsely represent all of the Products are derived from cows that were treated humanely, when, in fact, Defendants' lack of oversight allowed cows to be treated inhumanely and contrary to Defendants' Animal Welfare Promises and branding of the Products as "fairlife."

416.    Plaintiff Rothberg seeks an order enjoining Defendants from continuing this false advertising. Absent enjoining this false advertising, Defendants will continue to mislead Plaintiff Rothberg and the New York Subclass members as to whether the Products were derived from cows that were treated humanely and, in doing so, irreparably harm each of the New York Subclass members.

417.    As a direct and proximate result of Defendants' violation of New York General Business Law section 350, Plaintiff Rothberg and the New York Subclass members have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Rothberg and the New York Subclass members also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages. N.Y. Gen. Bus. Law § 350-e(3).

418.    Therefore, Plaintiff Rothberg prays for relief as set forth below.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law,**
**73 Pa. Stat. Ann. § 201-1, *et seq.***
*By Plaintiff Hamilton on Behalf of the Pennsylvania Subclass Against All Defendants*

419.     Plaintiff Karai Hamilton reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

420.     Plaintiff Hamilton brings this claim on behalf of the Pennsylvania Subclass against Defendants for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. § 201-1 *et seq.*

421.     Plaintiff Hamilton and the Pennsylvania Subclass members purchased goods and services in "trade" and "commerce," as meant by Pennsylvania Statutes title 73, section 201-2(3), primarily for personal, family, and/or household purposes.

422.     Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce in violation of Pennsylvania Statutes title 73, section 201-3, including the following:

    i.      representing that goods have characteristics, uses, benefits, and qualities that they do not have, 73 Pa. Stat. Ann. § 201-2(4)(v);

    ii.     representing that goods are of a particular standard or quality if they are another, 73 Pa. Stat. Ann. § 201-2(4)(vii); and

    iii.    advertising goods and services with intent not to sell them as advertised, 73 Pa. Stat. Ann. § 201-2(4)(ix).

423.     Defendants' Animal Welfare Promises and branding of the Products as "fairlife," including Defendants' representations and omissions, were material because they were likely to deceive reasonable consumers.

424.     Despite Defendants Animal Welfare Promises and naming of the Products as "fairlife," Defendants did not have sufficient oversight to ensure that those promises were kept.

As a result, dairy cows were not treated in the manner in which consumers were promised when purchasing the Products.

425.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Hamilton and the Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

426.    Plaintiff Hamilton and the Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

427.    Therefore, Plaintiff Hamilton prays for relief as set forth below.

**TWENTY-THIRD CLAIM FOR RELIEF**
**Violation of Texas's Deceptive Trade Practices-Consumer Protection Act,**
**Tex. Bus. & Com. Code Ann. § 17.41, *et seq.***
*By Plaintiffs Velez and Hamilton on Behalf of the Texas Subclass Against All Defendants*

428.    Plaintiffs Arnetta Velez and Karai Hamilton reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

429.    Plaintiffs bring this claim on behalf of the Texas Subclass against Defendants for violation of Texas's Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.* ("TDTPA").

430.    Under the TDTPA, "trade" and "commerce" mean "the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state." Tex. Bus. & Com. Code Ann. § 17.45(6).

431. Defendants engaged in trade and commerce within the meaning of the TDTPA when they advertised, distributed, and sold the Products, and when they offered the Products for sale, to Plaintiff Velez and Hamilton and the members of the Texas Subclass.

432. The TDTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code Ann. § 17.46(a).

433. Under the TDTPA, the term "false, misleading, or deceptive acts or practices" includes the following acts:

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

. . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

. . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

. . .

(9) advertising goods or services with intent not to sell them as advertised;

. . .

(20) representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve . . . ;

. . .

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed . . . .

Tex. Bus. & Com. Code Ann. § 17.46(b)(2), (5), (7), (9), (20), (24).

434.    Defendants' misrepresentations included those on the labels of the Products, themselves, and were designed to be read and understood by each and every consumer that purchased the Products.

435.    The misrepresentations were material, because they went directly to the quality and nature of the Products, themselves, as promising buyers a way to purchase dairy products while at the same time ensuring that the entities who produce the dairy products prioritize animal welfare.

436.    Consumers who purchased the Products purchased them because of the misrepresentations and were willing to pay more to guarantee that the entities who were in the business of creating the Products ensured the safety, health, and well-being of their dairy cows.

437.    The misrepresentations on the Products were and are material and Texas Subclass members purchased the Products in reliance on those misrepresentations.

438.    By engaging in the actions, misrepresentations, and misconduct set forth herein, Defendants violated, and continue to violate, each provision of the TDTPA set forth in the preceding paragraph.

439.    Defendants' violations of the TDTPA were committed knowingly and intentionally as the TDTPA defines those terms in section 17.45(9) and (13), respectively.

440.    Defendants knew or should have known their representations about the Products were false and misleading for the reasons detailed above.

441.    Plaintiffs Velez, Hamilton, and the Texas Subclass members relied on Defendants' violations of section 17.46(b)(2), (5), (7), (9), (20), and (24) to their detriment. Plaintiffs Velez, Hamilton, and the Texas Subclass members would not have purchased the Products had they known that Defendants' representations, including the Animal Welfare

Promises and name "fairlife," were false and misleading, as detailed herein.

442.    Plaintiffs Velez and Hamilton bring this claim pursuant to section 17.50(a)(1) of the TDTPA on account of Defendants' use and/or employment of false, misleading, and deceptive acts or practices as detailed above.

443.    Plaintiffs Velez and Hamilton also bring this claim pursuant to section 17.50(a)(2) of the TDTPA on account of Defendants' breaches of their express warranties, as detailed herein.

444.    Plaintiffs Velez and Hamilton also bring this claim pursuant to section 17.50(a)(3) of the DTPA because Defendants' course of conduct set forth herein is unconscionable.

445.    Defendants' conduct as described herein and throughout was uniform: they made uniform, on-the-label representations on Products concerning animal welfare, when, in reality, it could not even guarantee that animals at their "flagship farm" were treated in accordance with Defendants' Animal Welfare Promises.

446.    Plaintiffs Velez and Hamilton seek, individually and on behalf of the Texas Subclass members, economic damages in an amount to be determined at trial and treble economic damages on account Defendants' knowing and intentional conduct, along with reasonable attorney's fees and costs and such other and further relief that the Court deems just and proper. See Tex. Bus. & Com. Code Ann. § 17.50(b)(1), (b)(3), (b)(4), (d).

447.    Plaintiffs Velez and Hamilton request, individually and on behalf of the Texas Subclass members, that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs Velez and Hamilton and the Texas Subclass members will be harmed in that they will continue to be unable to rely on Defendants' representations about the Products set forth above. See Tex. Bus. & Com. Code Ann. §

17.50(b)(2).

448.    Therefore, Plaintiffs Velez and Hamilton pray for relief as set forth below.

**TWENTY-FOURTH CAUSE OF ACTION**
**Violation of the Virginia Consumer Protection Act of 1977,**
**Va. Code Ann. § 59.1-196, *et seq.***
*By Plaintiffs Parlow and Tsiptsis on Behalf of the Virginia Subclass Against All Defendants*

449.    Plaintiffs Christina Parlow and Demetrios Tsiptsis reassert the allegations set forth in paragraphs 1 through 143 and incorporate such allegations by reference herein.

450.    Plaintiffs Parlow and Tsiptsis bring this claim on behalf of the Virginia Subclass against Defendants for violation of the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-196, *et seq.*

451.    Defendants are each a "supplier," as defined by Virginia Code section 59.1-198.

452.    Defendants engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods," as defined by Virginia Code section 59.1-198. Defendants advertised, offered, or sold goods used primarily for personal, family or household purposes.

453.    Under the Virginia Consumer Protection Act of 1977:

The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

. . .

5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

. . .

8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.

. . . [and]

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction . . . .

Va. Code Ann. § 59.1-200(A)(5), (6), (8), (14).

454. Defendants engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation, including, but not limited to, Defendants' Animal Welfare Promises and branding of the Products as "fairlife," in connection with consumer transactions, as described herein, in violation of each of the provisions set forth in the preceding paragraph.

455. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

456. Defendants' made the misrepresentations because consumers purchased the particular Products given the representations made about the ethical treatment of dairy cows. But Defendants made these representations without any mechanism in place—or intention to develop such mechanism—to ensure that those practices were being followed as described to Plaintiffs and the Virginia Subclass.

457. As a direct and proximate result of Defendants' deceptive acts and practices, the Plaintiffs Parlow, Tsiptsis and the Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

458. Defendants' violations present a continuing risk of injury to Plaintiffs Parlow, Tsiptsis and the Virginia Subclass members, as well as to the general public.

459. Plaintiffs Parlow, Tsiptsis and the Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the

amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

460.    Therefore, Plaintiffs Parlow and Tsiptsis pray for relief as set forth below.

## TWENTY-FIFTH CLAIM FOR RELIEF
### Wisconsin Prohibition on Unfair Methods of Competition
### Wis. Stat. § 100.20, *et seq.*
*By Plaintiff Birt on Behalf of the Wisconsin Subclass Against All Defendants*

461.    Plaintiff Terri Birt reasserts the allegations set forth in paragraphs 1 through 143 and incorporates such allegations by reference herein.

462.    Plaintiff Birt brings this claim on behalf of the Wisconsin Subclass against Defendants pursuant to Wisconsin Statutes section 100.20.

463.    Under Wisconsin Statutes section 100.20(1):

Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

464.    Under Wisconsin Statutes section 100.20(2)(a), the Wisconsin Department of Agriculture, Trade, and Consumer Protection "may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair."

465.    Under Wisconsin Statutes section 100.20(5):

Any person suffering pecuniary loss because of a violation by any other person of . . . any order issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney fee.

466.    The statutory note to Wisconsin Administrative Code, Chapter ATCP 90 ("Fair Packaging and Labeling") states:

This chapter is adopted under authority of . . . [ss.] 100.20 (2), Stats. Violations of this chapter are subject to the penalties and remedies provided under . . . [ss.]

100.20 (5) and (6), and 100.26 (3) and (6), Stats.

467.    Under Wisconsin Administrative Code section ATCP 90.10(1):

Except for meat and poultry products under sub. (2), food sold or distributed for sale in this state shall be labeled in compliance with applicable rules adopted by the United States food and drug administration under 21 CFR 101, 102, 104, 105 and 130.

468.    Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., "[a] food shall be deemed to be misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1).

469.    As fully alleged above, Defendants violated § 343(a)(1), Wisconsin Administrative Code section ATCP 90.10(1), and Wisconsin Statutes section 100.20 by falsely and misleadingly labeling and marketing the Products sold to Plaintiff Birt and the Wisconsin Subclass members.

470.    Plaintiff Birt and the Wisconsin Subclass members would not have purchased the Products had they known that contrary to Defendants' Animal Welfare Promises and Defendants' representations, Defendants were unable to ensure that the cows from which the Products were derived were, in fact, treated humanely.   As is demonstrated by ARM's investigation, Defendants failed to ensure that dairy cows were treated in accordance with its Animal Welfare Promises and name "fairlife."

471.    Plaintiff Birt and the Wisconsin Subclass members seek twice the amount of their pecuniary losses, together with costs and attorneys' fees, pursuant to Wisconsin Statutes section 100.20(5).

472.    Plaintiff Birt and the Wisconsin Subclass members seek to enjoin such unlawful acts and practices as described above. Each of the Wisconsin Subclass members will be irreparably harmed unless the Court enjoins Defendants' unlawful actions, in that Plaintiff Birt

and the Wisconsin Subclass members will continue to be unable to rely on Defendants' representations that the Products are derived from cows that were treated humanely.

473. Plaintiff Birt and the Wisconsin Subclass members seek declaratory relief; restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits; injunctive relief; and any and all other relief allowable under Wisconsin Statutes section 100.20.

474. Therefore, Plaintiff Birt prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of each of the Classes described in this Complaint, respectfully request the Court to enter an Order:

A.      certifying the proposed Class and Subclasses under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), and, in the alternative, (c)(4) as set forth above;

B.      declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

C.      declaring that Defendants have committed the violations of law alleged herein;

D.      providing for any and all injunctive relief the Court deems appropriate;

E.      awarding statutory damages in the maximum amount for which the law provides;

F.      awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.      providing for any and all equitable monetary relief the Court deems appropriate;

H.      awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I.      awarding Plaintiffs their reasonable costs and expenses of suit, including

attorneys' fees;

J.     awarding pre- and post-judgment interest to the extent the law allows; and

K.     providing such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable.

Date: June 25, 2020            Respectfully submitted,

By:   */s/ Michael R. Reese*

Michael R. Reese
*mreese@reesellp.com*
George V. Granade
*ggranade@reesellp.com*
Maurice L. Hudson
*mhudson@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

Adam J. Levitt
*alevitt@dicellolevitt.com*
Amy E. Keller
*akeller@dicellolevitt.com*
Adam Prom
*aprom@dicellolevitt.com*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

Melissa S. Weiner
*mweiner@pswlaw.com*
Joseph C. Bourne
*jbourne@pswlaw.com*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600

*Counsel for Plaintiffs*